No. 2563.

## Bob Hines v. The State.

Practice—Corroboration of Accomplice Testimony—Charge of the Court—Quære.—If the proof tends to raise the question whether or not a State's witness is an accomplice in the offense on trial, can the trial court, in any state of case, refuse to submit to the jury the question of accomplice vel non, together with proper instructions upon the corroboration of accomplice testimony? If so, it must not only be because the proof that the witness is an accomplice is meagre, but because the other proof in the case tends strongly to show that he is not. The proof in this case fairly mooting the complicity of the two State's witnesses, the trial court erred in refusing to instruct the jury upon the law of accomplice testimony.

Appeal from the District Court of Marion. Tried below before the Hon. W. P. McLean.

The conviction in this case was in the first degree for the murder of Ike Bailey, in Marion county, Texas, on the twenty-eighth day of March, 1888. Death was the penalty assessed against the appellant.

W. B. Stallcup was the first witness for the State. He testified, in substance, that in March, 1888, he was acting constable in and for precinct No. 5, of Marion county, Texas. On Friday, the thirtieth day of that month, the witness was called upon to hunt for Ike Bailey, or for his dead body. Bailey's body, which had been dead some hours, or perhaps days—witness could not say how many—was found on the said Friday in an old field known as the "lake" field. The place in the field where the body was found was about a quarter of a mile distant from the house of the defendant, and about a mile and a half distant from the house of the deceased. The searching party consisted of forty or fifty people. They met at the house of the deceased and proceeded thence to the field of defendant, passing the defendant's house. Will Hartsaw had found the body in the "lake" field when the witness reached him. The witness had known Ike Bailey since the close of the war, and readily identified the body found as that of the said Ike Bailey. The body lay with the arms drawn up to the head, and a trail on the

ground showed that it had been dragged about twenty-five yards. The witness saw three gunshot wounds on the body, one in the left side, one in the forehead and the third struck the skull. The skull was badly broken and appeared to have been mashed in with a blunt instrument of some kind. The witness arrested the defendant and Dan Franklin upon the charge of murdering the deceased. The witness then took defendant before the coroner's jury. Witness had no personal knowledge of any trouble between the defendant and the deceased. The witness had a conversation with Armstead Cove, the half brother of defendant, which led to the finding of the gun which is now in evidence. The piece of wood now exhibited by the witness was part of a broken gun stock which was said to have been found at the place of the murder by Jeff Melton and Jim Mitchell. The gun in evidence was found by the witness about an hour and a half before day on Saturday morning, in a brush heap. It was a double barreled shot gun, the stock broken at the breach, one barrel broken and both barrels bent. The brush heap in which the gun was found was about a quarter of a mile from the place of the killing, in the "lake" field, which was near the field occupied and cultivated by the defendant. The said gun was delivered to Captain DeWare, by the witness, on Saturday morning. John Gray, Will Hartsaw and two or three others were with the witness when he found the gun. The witness saw blood only at the point where the killing occurred. He examined the body of Ike Bailey carefully, but found no weapons of any character on it.

On his cross examination the witness stated that he saw foot tracks near the body, and other foot tracks at the crossing of a branch about seventy-five yards east from where the body was found. The tracks that crossed the branch were the tracks of one man, and they showed that the shoes worn by him were not mates. Henry Davenport was one of the negroes who were with the witness and the parties who examined the foot tracks, and he then had on a pair of shoes which did not mate with each other. Witness did not hear Davenport deny that he made the tracks that crossed the branch, but on the contrary he said that he "passed along there" on Wednesday. Neither the piece of gun stock nor the ramrod were found by witness, and he did not know how far the points at which they were found were from the place of the killing.

Armstead Cove testified, for the State, that he and the defendant were half-brothers, and that he lived at the defendant's house at the time that Ike Bailey was killed. The witness left the defendant's house early on the morning of the day on which Ike Bailey was killed, and went to Gray's field to work. The broken gun that is now in evidence belonged to the witness. It was in the defendant's house, where the witness always kept it, on the morning of the fatal day, when the witness left to go to work. It was not then broken, but one of the tubes was gone. On the evening of that day the defendant came to Gray's field where the witness was at work, and told him that he, defendant, had killed Ike Bailey, and that in the "rucus" he had broken the witness's gun. On the next morning, at the horse lot, the witness asked the defendant where the gun was, and the defendant pointed to some brush heaps and said: "It is hid in one of them." On the night after the finding of Ike Bailey's body, the witness went with Mr. W. B. Stallcup, who had him in charge, to the brush heaps pointed out to him by the defendant, and found the gun in one of them. The gun was broken when found. Witness turned over two or three of the brush heaps before he found the one in which the gun was concealed. Mr. Stallcup then had the ramrod which belonged to that gun, but witness did not know where he got it. Witness did not remember that he denied to Stallcup that the ramrod belonged to his gun, but if he did it was because he was frightened, and was afraid of the large number of armed men who were present, threatening to hang all of the parties who had been arrested. The barrel of the gun which would shoot was loaded on the morning of the fatal day when witness left defendant's house. When the witness started to Gray's field on that morning the defendant was near his house cutting some poles to repair his fence.

Cross examined, the witness said that the last time he handled his said gun was about two weeks prior to the killing of Ike Bailey. George Marshall was the person who last had the said gun prior to the fatal day. When the defendant came to the witness in Gray's field, on the evening of the fatal day, and told him that he had killed Ike Bailey, he said that Ike Bailey struck him and cut him in the shoulder, and that he then knocked Ike on the head with the gun. The witness observed then that the defendant's coat, which was now in Jefferson, was cut on the shoulder. The defendant's mouth was bleeding

when he reached Gray's field on that evening, and witness saw indications of a recent wound on his face. The discovery of Ike Bailey's body attracted a large crowd of persons, many of whom were armed. Their evident excitement, and threats to hang all of the parties who had been arrested, frightened and terrified the witness. W. B. Stallcup and Will Hartsaw arrested the witness and took him to the inquest. Some parties then seized the witness and pulled him from the house in which the inquest was being held, and dragged him to the gate, where they were stopped by Mr. Gray and Mr. Colzin, who interfered on behalf of the witness.

On re-direct examination by the State, the witness stated he had never before told anybody that the defendant told him that Ike Bailey struck and cut him before he, defendant, killed him. Witness told the district attorney that the defendant told him that he, defendant, killed Ike Bailey, but he did not remember that he told the district attorney that he knew nothing more about the killing. The gun which the witness and Stallcup found in the brush heap, and which is now in evidence, belonged to the witness  That gun was in the defendant's house, loaded in one barrel, when witness left that house on the fatal morning, to go to Gray's field.

Jim Mitchell was the next witness for the State. He identified the piece of wood exhibited to him as the piece of the stock of a gun which he found at the place of the killing. It was, he supposed, a fragment of the stock of the gun identified on this trial as the gun of Armstead Cove, as it fitted to a nicety the broken place in the stock of that gun. The witness found the said piece of wood on the ground where Ike Bailey was killed, which place was about seventy yards from where the body was subsequently found. The witness found it exactly where Bailey's head lay after he fell, as shown by the blood and an indentation in the ground. The ramrod now exhibited to the witness was found on the ground a very short distance from where the killing occurred. Bailey's body was dragged from the point where the killing occurred to the point where it was subsequently found, as shown by the drag mark on the ground. Bailey's body was found in what was known as the "lake," or Posey field, which at that time was cultivated by the defendant —the defendant's house being about a quarter of a mile from where the body was found. There was an old and nearly filled up well a short distance from where the body was found, and

the head was found lying next and towards the well. The ground indicated that the body had been dragged from the place of killing towards the old well. No weapons of any kind were found on or about the body. The witness saw the defendant very soon after Bailey's body was found, but saw no wounds on his face or elsewhere on his person.

Cross examined, the witness said that the inquest was held on Friday morning, and on that evening the witness went to the scene of the murder to hunt for shot. Mr. Hartsaw was the first person to discover the body. Foot tracks led from the place where witness found the piece of gun stock to where the body was found. He saw other tracks crossing the branch.

M. C. Stallcup, justice of the peace of precinct No. 5, Marion county, testified, for the State, that he knew the deceased in his life time, and knew the defendant. The defendant was charged by affidavit in the witness's court with the theft of seventeen hundred pounds of seed cotton from the deceased. The affidavit was made by the deceased, and the deceased and Henry Davenport were the principal witnesses against defendant. The witness, sitting as an examining court, bound the defendant over to the district court. Subsequently the defendant came to see the witness about replevying the cotton. The witness would have held his next court on March 30, 1888. Deceased was supposed to have been killed on March 28, 1888. No settlement of the cotton matter between the deceased and the defendant was ever reached in the witness's court. Henry Davenport testified on the trial of defendant before witness, in the interest of deceased. Witness had no personal knowledge of a subsequent difficulty between deceased and Davenport about a sum of money that deceased was to pay Davenport for testifying for him. The witness did not know where Davenport was at the time deceased was killed.

Henry Davenport testified, for the State, that some time prior to the death of Ike Bailey the latter and the defendant had trouble about some cotton. Witness knew nothing about the merits of that difficulty, nor did he know as a fact that the cotton taken by the defendant belonged to Bailey. He thought it was proved that the cotton belonged to Bailey.

Cross examined, the witness said that he ate dinner at the house of Mr. Frank Reynolds on the Wednesday preceding the Friday on which Bailey's dead body was found. He had his gun when he left Reynolds's house on that afternoon, but **did**

not have a coat nor a shot pouch. From Reynolds's house wit-ness went to Parker's and thence home, meeting Mr. Jeff Melton. Witness was not out hunting, but having his gun he shot a squirrel. From Parker's house witness did not go back to Reynolds's, but went to Adkisson's. The witness was present when Bailey's body was found, but did not on that occasion deny his track which was found near the place where the body was found. It was on Friday night that Bailey's body was found. Witness knew Dan Franklin. Dan Franklin and his sister came to the witness's house on Wednesday night. Wit-ness did not remember that Dan Franklin told him that he was going to Ike Bailey's house to borrow a mule, and that in reply he told Franklin that old man Ike Bailey was not at home but was down in the "lake" field dead, with his brains shot out. The witness denied that he ever told Hartsaw or Melton, in words or substance, that old man Ike Bailey was down in the "lake" field with his brains shot out. The witness denied that he ever received any money from Ike Bailey for swearing for him in the case against the defendant for stealing the cotton. He denied that Bailey ever promised to pay him any sum for swearing for him on that trial, or that he ever said in the presence and hearing of Lucy Marshall, or any body else, that Bailey promised to pay him five dollars for swearing against defendant on that trial, and then refused to pay it. Witness had received money from Bailey as wages for work done. To make his denial emphatic, the witness again stated positively that he did not, on Wednesday night, tell Dan Franklin and his sister that Ike Bailey was out in the "lake" field dead, with his brains shot out. With equal emphasis he re-asserted that, although he saw Mr. Jeff Melton on Thursday evening, he did not tell him that Ike Bailey was in the "lake" field dead, with his brains shot out. He did not tell Jeff Melton that he dreamed that Bailey was in the "lake" field with his brains shot out. Witness went to Mr. Gray's house on that night [which night?], but did not tell Gray that Bailey was dead, with his brains shot out, nor did Gray tell witness that, as he knew Bailey was dead, he was bound to know something about his death. The witness was not with Mr. Hartsaw at the instant that Hartsaw found the dead body. Hartsaw did not call witness's attention to a foot track and tell him that the track was made by a man who wore shoes that did not match. Witness told Hartsaw that he, witness, passed along there on

Wednesday, the second day before the body was found. The witness said, at Mr. Johnny Gray's, that it was strange that Ike Bailey was missing, as he had agreed with witness to plant corn on the next day—Thursday. The witness's gun was at home and was not broken.

Allen Zachary testified, for the State, that he was one of the congregation present at the Gethsemane church in Marion county, on the third Sunday in March, 1888, on which occasion the Reverend Dyer preached. When services began, the witness, defendant and others were outside. Ike Bailey came to the door and called to all members to come in, as services were about to begin. Defendant said to witness: "Pay no attention to Ike Bailey. He is a grand rascal, and I am going to kill him."

Cross examined, the witness said that the church service referred to by him was held about two weeks before the body of Bailey was found. Witness lived in the "bend," and rented land from Jim Mitchell, who was a witness in this case. A large crowd attended church on the Sunday referred to. Witness knew everybody there, but would not undertake to say what particular person or persons were with him and defendant when Bailey announced the opening of services, and when defendant said that he was going to kill Bailey.

Wallace Clinton testified, for the State, that the defendant came to his place on the Monday night previous to the Friday on which Bailey's body was found. In the course of a conversation with witness, defendant said that he had been required to give a bond about a bale of cotton, and that if Ike Bailey fooled with him he would shoot Ike's heart out and go to the penitentiary. Witness replied: "Bob, if I was you I would not do that." Defendant remained at witness's house until the next morning, and a few days later the witness heard that Ike Bailey was missing. Witness was summoned by Stallcup, and helped to search for the body of Ike Bailey, and saw it after it was found. He saw no foot tracks immediately at the body. The witness and the party he was with then went to the place where, as shown by the indented ground, Bailey was killed, and about ten steps from that place the witness saw (pointing to the defendant's feet) the tracks of those run down shoes. Those tracks were the tracks of the shoes the defendant had on the previous Monday night, and on the morning that the body was found, and that he was wearing on this trial. The witness

not only observed the tracks and shoes closely, but he knew the defendant's track, and on oath now states that the tracks that he saw near where the killing occurred were the tracks of the defendant. When witness advised defendant not to execute his threat to kill Ike Bailey, defendant replied: "By God, I will do it, and go to the penitentiary."

Cross examined, the witness said that it was at Lewis Watson's house that defendant said he would kill Ike Bailey if he fooled with him, and go to the penitentiary. Defendant got breakfast at Lewis Watson's house, and witness observed his run down shoes on that morning. Henry Jackson came to Lewis Watson's on that morning, and, the witness thought, was speaking to Lewis about some fodder when defendant made the threat. Defendant came to Watson's house in the night, but it was after breakfast when he uttered the threat to kill Ike Bailey. Witness observed the defendant's shoes on that morning more particularly because the day was damp and cool, and the shoes were open and worn. When on the ground where the body was found, the witness heard Mr. Hartsaw tell Henry Davenport not to deny his, Davenport's, track. The defendant did not aid in the search for Bailey's body, and was about the only resident of the neighborhood who did not.

Alf Quinn testified, for the State, that he was one of the party that made the search for the dead body of Ike Bailey. The defendant was not one of the searching party. At the place where the body was discovered the witness found a hat and coat, a saddle and a blanket. He saw a gun at the same place, but was not present when the gun was found. Soon afterwards, at Ike Bailey's house, the witness saw a ramrod in the possession of Mr. Stallcup. The ramrod in evidence is the ramrod he saw at Bailey's house in the possession of Stallcup. He recognized it then and identifies it now as a ramrod he, witness, made. He and Jimmy Dedman went coon hunting one night previous to the death of Ike Bailey, and took the gun in evidence with them. There was then no ramrod to the gun, and the witness made the one that is now in evidence. On his cross examination the witness said that there could be no mistake about the ramrod being the one he made for the gun in evidence. Witness had a general acquaintance with that gun, and had used it since the night on which he took it coon hunting and made the ramrod for it. He borrowed the gun on that night from Jimmy Dedman. It was not a neighborhood

gun. It was on Friday night that witness saw the ramrod for the first time after the disappearance of Ike Bailey. It was then in Esquire Stallcup's possession. The hat, saddle and blanket belonged to Ike Bailey. Witness did not see a bridle at or near the place where Bailey's body was found. On the previous day—Thursday—the witness saw Ike Bailey's mule. It had on a bridle but no saddle nor blanket. Bailey let his mule run out, but not on the range in which witness saw it. At the time that the witness made the ramrod that is now in evidence the gun belonged to Jimmy Dedman.

Jim Dedman testified, for the State, that at one time he owned the gun that is now in evidence. He had not seen it for a month or more at the time of the killing of Bailey, and did not know who owned it at that time. He remembered going coon hunting with Alf Quinn some time before the killing, and of taking the said gun along, and it was his recollection that Quinn made a ramrod for the gun on that night.

W. B. Stallcup, recalled by the State, testified that the gun was broken and bloody when he found it. Some of the blood came off and stained the witness's hands. Witness last saw the gun on the day previous to this testimony. It was then in the possession of Captain DeWare, and was in the condition it was when found.

T. C. Burks testified, for the State, that he remembered the examining trial of the defendant upon the charge of stealing cotton from Ike Bailey. It occurred about three weeks prior to the killing of Ike Bailey. The result of that trial was the binding over of defendant to the district court. On the day of, but after the examining trial, the defendant appealed to the witness to go on his bond. In urging witness to sign the bond, he said that witness would assume no danger or loss, as Ike Bailey would never get into court.

Cross examined, the witness said that the bond defendant requested him to sign on the day of the examining trial was an appearance and not a sequestration bond. He did not on that day ask witness to sign a sequestration bond, but did afterwards, when witness declined. When he asked witness to go on the appearance bond, the defendant asked witness how he could get possession of the cotton, and he afterwards requested witness to sign his sequestration bond. The cotton which defendant was charged with stealing from Bailey was hauled to the witness's gin by the defendant. It was not afterwards

placed in the witness's custody by legal process, nor was it seized by an officer under legal process, but was turned over to Ike Bailey by the witness upon the order of Mike Stallcup. Defendant lived on witness's place two or three years. Witness, though now on friendly terms with defendant, was then a little "wrathy" with defendant, and declined to go on his bond because he was not willing to help a man who would not pay him what he owed.

John Watts testified, for the State, that he saw Ike Bailey, at his, Bailey's, house on the morning of his death—Wednesday, March 28, 1888. Bailey was then at home. His mule was tied at the fence in front of his house, and he told witness that he was going off to hunt for his other mule. Cross examined, the witness said that he was passing Bailey's house when he saw Bailey on the fatal Wednesday morning. Bailey shut the door of his house and came to the front gate. Witness saw no person but Bailey at the time, but could not see into the house. The witness, who was related to Bailey by Bailey's marriage, lived on Mr. John Gray's place. Bailey's wife was dead, and no person was living with Bailey at the time of the murder.

Nathan Wilson was the next witness for the State. He testified that he had a conversation with the defendant a few days before the killing of Ike Bailey. Defendant, on that occasion told witness that he had a world of trouble, and that Ike Bailey would not be a living man when Mike Stallcup's court next convened. Cross examined, the witness said that he lived in the "bend," and in the neighborhood in which defendant lived. Witness did not like to have defendant living where he did. In fact the witness did not like that neighborhood. The neighborhood further up the river—about where Mr. Stallcup lived—was more to the liking of witness. It "beat" defendant's neighborhood. It was more pious, and the climate was better. No person was within a quarter of a mile of witness and defendant at the time of the conversation in which defendant said that Bailey would not be a living man when Stallcup's court met. Stallcup's court was not in session on that day. The witness knew that the defendant had a case in Stallcup's court, but he did not know that it had already been decided. The witness was not engaged in preaching on the day of the conversation with the defendant. He was engaged in cutting rails at a point between three and four hundred yards distant

from Pleas Goyne's house, and just beyond Shar Smith's house, and not far from the pond near Smith's store. Defendant, on his way to town, after eating dinner at Goyne's house, went with witness to where he was splitting rails. He first met defendant on that day just beyond the pond, the witness then being on his way to Smith's store for a plow point that was wanted on the widow Luster's place. Defendant said something about the cotton trouble beeween him and Ike Bailey, but that part of the conversation already stated by witness was all that he recollected. Witness afterwards told Cal Bailey, Ike Bailey's step son, what defendant said to him.

Ida Marshall testified, for the State, that she lived with her mother, who lived on defendant's place, less than half a mile from defendant's house. She knew Ike Bailey's mule. That mule, with only a bridle on, came to the house of the witness's mother late on one cloudy evening. It went thence towards the branch. Witness did not know from which direction it came to the house.

Doctor T. H. Stallcup testified, for the State, that he saw the dead body of Ike Bailey on the morning of March 30, 1888, at which time, as indicated by the progress of decomposition, it had been dead from forty-eight to seventy-five hours. There were three gun shot wounds on the body. One shot entered the left hand, between the third and fourth fingers. Another entered the left side. These two wounds were superficial, or at least would not have produced death. The third wound, which was necessarily a fatal one, and which must have caused instantaneous death, entered the forehead. The skull was also fractured in two places, the result of blows inflicted with a bludgeon, either of which fractures was in itself a necessarily fatal wound. The witness extracted the ball from the head, which was now in the possession of the witness's brother, who was in court. The ball, being obtained, was exhibited to the witness, who stated that he could not say that it was the ball he extracted from the head of Bailey. The ball he extracted he thought was a thirty-two calibre pistol ball. The witness knew but little about pistols or pistol balls. The skull wounds were of such character as would have paralyzed Bailey and rendered him insensible. Those wounds alone, if inflicted on March 28, and Bailey was left as he fell until March 30, must have produced death, independent of the gun shot. The witness did not think that, after receiving the skull wounds the

deceased could have crawled. Witness had known men to re-cover from gun shot wounds in the head. He had known men to survive skull fracture, and to recover after the removal of a piece of skull as large as a man's hand.

Armstead Cove, recalled by the State, testified that he did tell Doctor Stallcup (meaning, evidently, Esquire Stallcup) that when the defendant came to him in the field on the evening of the fatal day, blood was flowing from his mouth. He denied that his statement was that there was nothing the matter with defendant except that there was a small "splotch" of blood under one eye.

Mike (Esquire) Stallcup, recalled by the State, testified that he saw defendant soon after his arrest. At that time there were no visible wounds or scratches on his person. Soon after that the witness had a conversation with Armstead Cove, in the course of which said Cove stated that there was nothing whatever the matter with defendant when he reached the field on the evening of the fatal day, except that he had a small "splotch" of blood on his right hand and another under the eye. He did not say that blood was then flowing from defend-ant's mouth. After the prosecution against defendant for stealing Bailey's cotton was instituted, and after witness bound him over to the district court, the defendant several times spoke to witness about instituting a suit to try the right of property to the cotton. Judging from a note about the matter, written to him by Mr. Rowell, the witness supposed that Rowell was to act as attorney for defendant in that matter. On cross examination the witness stated that Ike Bailey was in town when his cotton was claimed to have been stolen by defendant. Henry Davenport was the principal witness who testified against the defendant on the examining trial. Ike Bailey was also a witness, and testified to the ownership of the cotton and to the want of consent to the taking of the same. The ball now exhibited to the witness was the ball that was taken from Ike Bailey's head.

W. B. Stallcup, being recalled by the State, testified that there was but one tube on the gun when found by him and Cove. There was a part of an exploded cap on the other tube. It did not appear to have been long exploded. Cove went direct to the particular brush heap in which the gun was found, and went direct to the particular side of that brush heap where it was concealed.

Will Hartsaw testified, for the State, that he found the dead body of Ike Bailey in the edge of an old field, near an old well that was filled up to within four or five feet of the surface. Fifty or sixty people. some horseback and some on foot, were "breasting" through the woods, about fifty yards apart, when the witness discovered the body. He immediately blew his horn, and the crowd gathered about the body. Mr. Stallcup was among the last of the party to reach the body. The body was examined where it was found, but no weapon of any kind was discovered about it. Further search discovered the place where Bailey was killed, and where he had been dragged or had crawled to the place where the body was found. Near the place of the killing a ramrod, but no gun or other weapon, was found. On the next morning, before day, Armstead Cove went to a brush pile and got the gun. The witness was one of the parties who went with him. Cove got the gun from the brush heap he first went to. That gun was broken, and is the identical gun that is now in evidence.

William Watts testified, for the State, that he was the nephew of Ike Bailey. He knew the defendant and knew that, about the time of the killing of Bailey defendant owned, or had possession of, a white handled five shooting pistol.

On cross examination, the witness said that he did not know that the pistol he saw in the defendant's possession on or about the time of the killing was the property of Jim Williams, nor did he know that Jim Williams owned a pistol. The witness was present at the inquest, and knew that defendant and Armstead Cove were taken to the woods. He knew that neither defendant nor Cove were tied when they were taken from the inquest into the woods. He knew nothing about defendant being hung to a tree.

W. B. Stallcup, being again recalled by the State, testified that he arrested the defendant on Friday night, on the premises of George Gray, and about a mile from defendant's house. It was about eleven o'clock when he made the arrest. Defendant was then lying on a pallet with Dan Franklin in an unlighted room. Witness went to the defendant's house before he went to Gray's place. The witness did not know that defendant plowed on Gray's place for Mr. Gray on that Friday.

Alex Walton testified, for the State, that he was at George Watts's house when defendant was there on the day referred to by the witness William Watts. That was about a week before

Bailey was killed. Defendant had a white handled five shoot-ing pistol on that day. Lucy Marshall lived on the place of the defendant.

On his cross examination, the witness said that he saw the pistol in defendant's possession at George Watts's place prior to the time above mentioned—about a month before. On that oc-casion defendant pulled the pistol on the witness, who had offered to fight him a fair fight if he would lay the pistol down. The pistol was a thirty-two calibre, and at the time last referred to it belonged to Dan Franklin. Witness's wife was a sister of Watts, and a niece of Bailey.

Sheriff DeWare testified, for the State, that, in answer to a note from Mr. Stallcup, he started to the place where Bailey was killed, between five and six o'clock on Saturday morning. He met the party taking defendant to town. He had defend-ant in his personal charge for twenty miles, but observed no scratches nor bruises on his person.

The State closed.

The defense recalled Doctor T. H. Stallcup as its first wit-ness. Doctor Stallcup testified that he was unable to state whether Bailey was standing on his feet or was lying down when he was stricken on the head with the bludgeon. It was possible, but not at all probable, that Bailey was lying down when the blows on the head were inflicted. The witness thought the other wounds on Bailey were inflicted by pistol balls.

Henry Jackson testified, for the defense, that he went to the house of Lewis Watson on the day referred to by Wallace Clinton. He saw the defendant there on that day, talking to Wallace Clinton, but he did not notice the shoes then worn by the defendant.

Sheriff DeWare, recalled by the defense, identified the gun in evidence as the gun that was delivered to him by Mr. Stall-cup. The right hand barrel of the gun was then loaded and is loaded yet. The load was then extracted and exhibited to the jury. It consisted of a mixture of turkey and bird shot.

Jeff Melton was the next witness for the defense. He testi-fied that he was in his field on the evening before Bailey was killed, and that Henry Davenport came to the field on that evening. Bailey disappeared on Wednesday. On the evening of that day the witness saw Davenport back of his, witness's, field. Davenport then had a shot gun in one hand and a squir-

rel in the other. Davenport came to the witness's house on the night of the next day, Thursday, and said that Bailey was killed; that he knew Bailey was dead, because he left home and had not come back, and was still missing. He added: "He (Bailey) is killed, and his head is shot all to pieces." Witness remarked in reply: "How do you know he is killed? You must be implicated." Witness then said to Davenport: "I was sitting up with my children and heard a pistol shot." Davenport replied: "That shot didn't finish him. We went back and finished him after that shot." The witness was one of the first parties to reach Bailey's body after it was discovered. At a point about seventy-five or eighty yards distant from where the killing took place a track was found, and, although it could be found nowhere else than on the branch, it looked to have come direct from the body. The man who made that track avoided sandy places, and went up the branch above the ford and crossed under some brush. Henry Davenport was there, and his attention was called to that track. The witness found the ramrod that is now in evidence, and saw Bailey's hat and saddle near the place of the killing. The saddle was found about one hundred yards northeast from where the body was found, and about thirty steps from where the body first fell. The place where the witness found the ramrod was very nearly in the same direction from where the body was found that the saddle was; and, in going from the place where the ramrod was found to the place where the saddle was found, one would go in an almost direct line towards the body. Witness found no tracks along the "drag" from the place where the body fell to where it was found. When found the body was lying back down, and the hands were muddy. When the witness saw Henry Davenport on Wednesday evening—he could not say what time it was—he was going from the direction of the place where the killing occurred. Witness did not see Davenport after that until the following night. Witness saw, on the left hand side of the "drag," the tracks of what he took to be a small, high heeled shoe, and at the place where the body fell, very near to the indentation of the ground made by the head and shoulders of the body, the witness saw the track of a run down shoe. That track was different from the track found on the branch.

Will Hartsaw, recalled by the defense, testified that he saw Henry Davenport on the night before the body was found. On the next day Davenport reported that Bailey was missing.

Witness asked Davenport what had become of Bailey, and then, in reply to what Davenport said, how he knew that Bailey was dead. He replied that he knew Bailey was dead, and that he was shot all to pieces. He did not say where Bailey's body could be found. The witness saw the track on the branch about seventy-five yards from where the body was found, which track resembled the track of Henry Davenport. He told Davenport about that track and its remarkable resemblance to his track. Davenport replied that he did not deny that track as his, and that he had been at that place. The track which the witness took to be Bailey's track was a large track, and Bailey had on a new pair of number twelve boots. That track was running. The smaller track was also running. It was apparent from the tracks that the man who made the small tracks pursued the man who made the large track. There was no indication of a scuffle at the point where Bailey fell. On his cross examination the witness said that the track which resembled Davenport's was going almost direct—a very little angling—from the direction of the place where the body was found.

Dan Franklin testified, for the defense, that he lived on the place of George Gray, in the "Bend." The witness first heard of the disappearance of Ike Bailey on Thursday night at the house of Henry Davenport. Davenport told witness on that night that Ike Bailey was dead; that he knew Bailey was dead; that he went off on Wednesday and had not come back. He said: "Ike Bailey is dead, and he is somewhere in that 'lake' field." He said that he only imagined that Bailey was dead. The witness was arrested on the premises of Mr. Gray on Friday night. The witness and defendant were working—plowing—for Mr. Gray when the successful search for Mr. Bailey's body was made. The witness occupied a house on Mr. Gray's place, and with defendant and Jim Williams was sleeping in that house when the arrest of himself, defendant and Williams was made. Witness had no pistol on that night, but Williams had one. The witness once owned a white handled pistol. On his cross examination this witness said that Jim Williams had his washing done and kept his clothes at the defendant's house, but did not keep his pistol at defendant's house. If the pistol was at defendant's house on Thursday the witness did not see it. The witness denied that he told Davenport that old man Ike Bailey had been killed, and that when his body was found,

his head would be found shot all to pieces. · He denied that he ever told old Aunt Violet Davenport that Bailey had been killed, and that the killing was done with his, witness's, pistol. The witness and defendant were not the only parties in the neighborhood who did not join in the search for Bailey's body. Alex Courtenay and several others did not aid in the search. At that time Mr. Gray was on the witness's bond as a defendant in the charge of stealing Ike's cotton, and when witness was called upon to join in the search he had to go to Gray's to report where he was going to. Gray would not consent for the witness to go, as he said he did not want his plows stopped; consequently—and for that reason—the witness could not join in the search. On his re-examination the witness said that it was after supper on Thursday night when he went to Davenport's house. He stayed there all night, as did Henry Davenport. The white handled pistol which the witness once owned, he bought from Frank Reynolds.

Frank Reynolds testified, for the defense, that he lived about a mile and a half from defendant's house. Witness saw Henry Davenport in his, witness's, field between ten and eleven o'clock on the fatal Wednesday morning. Davenport went to witness's house between eleven and twelve o'clock on that day, ate dinner there and left between one and two o'clock. When he left he went east from witness's house, across the edge of the field and towards the "lake" field. He then had a shot gun, and a shot sack across his shoulders, on the outside of his coat. He went directly towards the point where the body was afterwards found. Before the arrival of Henry Davenport the witness heard some shooting from the direction of the place where the body was afterwards found. From what Davenport said to him on his arrival, witness supposed he did the shooting. He said to witness: "Now, suppose me and another negro was to get into a rucus, you white men ought not to have anything to do with it." Henry Davenport had never before been on the witness's premises, so far as the witness knew.

Cross examined, the witness stated that Henry Davenport could not be said to have stayed to dinner at witness's house on his, witness's, invitation, but, being there at dinner time, witness gave him his dinner. Prior to that day the witness had tried to sell to Davenport a certain hog of his that was running in Davenport's range, and on that day he renewed the negotiation in an effort to exchange the hog for some cotton which

Davenport had. Davenport said that he would have to con-sult his wife before trading, that he had promised to give her some money with which to buy Christmas "tricks." When Davenport left witness's house, after dinner on the said Wednesday, he went northwest toward the "lake" field, re-marking that he was going to kill some squirrels. Henry Davenport, on that day, told witness that he had been to old man Atkisson's house. He did not say that he had been at work for Atkisson. He said that he was afraid somebody would kill him.

George Gray testified, for the defense, that he went to the place where Bailey was killed, and where his body was found, four or five days after the finding of the same. Those places were about a quarter of a mile distant from Davenport's house, and on the most direct route from the defendant's house to the land which he, defendant, was then cultivating, and which land he rented from the witness. Defendant came to the wit-ness's house a day or two before the finding of Bailey's body, and, while sitting on the horse block at witness's house, he spat a mouthful of blood. That was between three and four o'clock on Wednesday evening. The witness knew Jim Wil-liams, but did not know his present whereabouts, nor where he was at the time of the killing of Bailey. Williams was in the witness's employ at the time Bailey disappeared. He then owned a white handled pistol. A week or two before Bailey was killed Williams got to shooting the pistol about the place, and witness took it away from him and put it in his, witness's, trunk. It was taken out of that trunk about a week after the killing. If the defendant ever owned a pistol the witness did not know it. The defense closed.

The State, in conclusion, introduced as a witness Violet, the wife of Henry Davenport. She testified that Dan Franklin came to her house on the night that Bailey's body was found, and asked if she knew where Bailey was. He then told wit-ness that Bailey was missing, and asked if witness knew whether or not there was anything wrong with Bailey. He then said: "If Ike aint come back yet, then Ike is killed, and, wherever he is, he is killed with my pistol, for I sold it to Jim Williams. Whoever has done it, I hope they have left life in him, so he can tell who it was."

Cross examined, this witness stated that she and her husband worked for Bailey on Tuesday, the day before his disappear-

ance. Bailey told them on Tuesday night to be certain to re-
turn on Thursday morning. They went back on Thursday
morning and worked on Bailey's place until about four o'clock
in the evening. The witness and her husband were the first per-
sons to feel uneasiness about Bailey. The witness did not know
where her husband was on Wednesday morning. He was not
at home to dinner. When he got home that evening he said
that he got his dinner at Mr. Reynolds's house. The witness did
not know what time Henry got home on that Wednesday even-
ing. Henry had neither coat nor shot sack when he left home
on Wednesday morning. Witness was lying down when Henry
got home on Wednesday evening. He asked her what was the
matter. She replied that she was lying there thinking of what
had become of old man Ike Bailey. Henry replied that if old
man Ike was killed and misplaced he was very sorry.

*W. T. Armistead, J. H. Culberson, Camp & Taylor* and
*J. E. McComb,* for the appellant: A conviction can not be had
upon the uncorroborated testimony of an accomplice, and the
evidence in this case being sufficient to moot the complicity of
the State's witness Cove, the trial cour: erred in failing and re-
fusing to instruct the jury upon the law applicable to the cor-
roboration of an accomplice witness.

Does the evidence in this case raise the complicity of the
witness Cove? The ramrod found on the ground near the
dead body was identified positively as the ramrod of his gun,
and the broken gun produced in evidence was identified and
admitted by him to be his gun. He was the person who first
told where the gun was concealed in the brush heap, and he
went directly to the brush heap with the officer, and there got
the gun and delivered it to the officer. According to his own
sworn statement on the stand, he kept locked in his own breast
the secret of Ike Bailey's death — protesting, indeed, that he
knew nothing whatever about Bailey's disappearance—from
Wednesday until midnight of Friday, when he disclosed it only
under the influence of fear, superinduced by the presence, if
not the threats, of an armed body of men. The said witness
Cove was shown to live at the house where the gun was usually
kept, and it was proved that he passed through the lake field
on the evening of the killing.

*W. L. Davidson,* Assistant Attorney General, for the State.

HURT, JUDGE. This is a conviction of murder of the first degree, with the death penalty. We have carefully examined all the grounds relied upon for a reversal of the judgment, and are of the opinion that none are well taken except that contained in the third assignment, to wit: "The court erred in failing and refusing to charge the law applicable to the corroboration of an accomplice, the witness Armstead Cove being an accomplice." The court's attention was called to this subject, and counsel requested a charge thereon, but did not prepare the charge. The court refused to prepare and submit to the jury instructions relating to this subject, and counsel for appellant excepted and reserved a bill.

No doubt the learned trial judge did not believe there was any evidence in the case raising this question, and hence the failure to charge thereon. It will not be questioned that if there be such evidence it was the duty of the court to instruct the jury with reference to the necessity and the character of corroboration required to authorize a conviction upon the testimony of an accomplice.

Was there evidence reasonably tending to show that Cove or Davenport, or any other witness upon whose testimony the State relied for conviction, was an accomplice? If so, under the facts of this case, the court should have instructed with reference thereto. What are the facts?

On Wednesday, March 28, 1888, in Marion county, Texas, in what is known as the Bend neighborhood, the deceased, Ike Bailey, left his house two miles from the "lake" field, where he was afterwards, on Friday, the thirtieth of March, found dead. He had evidently been killed, as in his head and body were two gun shot wounds, apparently of a rifle or pistol of thirty-two calibre. His skull was also fractured by blows from some heavy instrument. The body was found in the "lake" field about three hundred yards from the house of defendant Hines, on a path or road leading from Hines's house to the Gray field which Hines cultivated, and about twenty steps from an old well. Near the body of deceased were his saddle and saddle blanket. Wednesday evening, the same evening deceased left home, his mule, with bridle but no saddle or blanket on, was seen going from the "lake" field. A ramrod and a piece of the stock of a shot gun were found near the body. This ramrod was identified as the ramrod of Armstead Cove's shot gun, also the piece of gun stock. The tracks of Henry Davenport

were found going towards and from the body. Davenport was seen going in the direction of the "lake" field a short time before the killing, with a gun, and was seen going from the field late Wednesday evening. Late Wednesday evening, when Ike Bailey did not come home, Davenport told witness that Ike Bailey would not come home, that he had been killed, and his head shot and beat all to pieces. Thursday he told another witness the same in substance, and said he had been killed in the "lake" field. Wednesday Davenport ate dinner at witness Frank Reynolds's house—had his gun. He said to Reynolds: "If me and another negro gets into a rucus, you white men ought to have nothing to do with it." In the evening he went off with his gun in the direction of the "lake" field. Just after the shots were heard in the field, Davenport was seen going from the direction of the place where the shots were heard and the body afterwards found. He also told witness on Thursday, after the killing, that the first shot did not kill Ike Bailey. Davenport and his wife knew that Ike Bailey went to the "lake" field that evening, and were the only persons who knew of this so far as the evidence shows.

Witness Armstead Cove was the half brother of appellant, lived with him, and owned an old shot gun in very bad repair. The ramrod and piece of stock found by the body belonged to this gun. The night of the evening the body was found Armstead Cove, Henry Davenport, Jim Williams and appellant, were arrested and taken to the inquest separately. The constable was there, and also a crowd of armed men in an excited condition, threatening to kill all the prisoners. The prisoners were taken out and threatened with death if they did not confess. When it was brought to the knowledge of Armstead Cove that the ramrod was identified as being his, and himself being threatened with death, he said the appellant, Hines, told him at the horse lot that he had killed Ike Bailey with his (Armstead Cove's) gun, and pointed to some brush heaps and said the gun was under one of them. One hour and thirty minutes before daylight he, with the constable and others, he guiding them, went straight to the brush heap, and to the side of the heap where the gun was, stopping at no other, though he insisted that he had examined several others before finding the gun.

Ike Bailey (the deceased) and Bob Hines had had some trouble about some cotton, in which it was charged that Hines stole

the cotton from Bailey. Hines was under bond to appear to answer the charge. Davenport was the principal witness against Bob Hines in the cotton case. Two or three witnesses testified that Hines had threatened to kill Bailey.

The State attempted to explain some of the facts which tend to show that Cove and Davenport were accomplices, but this being a question for the jury, the court could not assume that the explanations were full and complete and withdraw the question accomplice *vel non* from the jury or refuse to call their attention to this question by proper instructions.

Again, there is no attempt to explain some of the most cogent facts which tend to show these witnesses to be accomplices. We mean by explain, to render these facts completely consistent with the hypothesis that neither Cove nor Davenport was an accomplice. Let us present a case so as to illustrate our views upon this subject.

There is evidence in a case tending to show that a witness upon whose testimony the State relies alone or in part for conviction was an accomplice, but the other facts in the case render it reasonably certain that the witness was not an accomplice. Can the trial judge assume these facts, to wit: the facts which render it reasonably certain that the witness was not an accomplice, to be true, and refuse to submit to the jury the law relating to the testimony of an accomplice? We seriously doubt if in any case the judge can so assume, and refuse to instruct upon the question of an accomplice. But to warrant the court in thus acting, the case must be one in which the testimony which tends to show the witness to be an accomplice is very slight, and the other facts must render it absolutely certain that he (the witness) is not an accomplice. The rule that the court should charge upon the theory of the case relied upon by the accused, should be applied to this question.

But, there being evidence strongly tending to show that Cove and Davenport were accomplices, do the other facts in the case render it even reasonably certain that they, nor either of them was not an accomplice? They do not; and hence the necessity for the proper instructions relating to the testimony of an accomplice.

We will relate briefly the facts bearing on Cove, which tend to show him an accomplice. Deceased was killed with his gun. He had access to the gun, it being in his house. He denied all

knowledge of the crime. He went at night with the officer and others to the brush pile—guiding them. He went to the pile, there being a number of brush piles in the clearing, in which the gun was concealed. He went direct to *the* pile containing the gun, and he went directly to *the side* of the pile where the gun was concealed. Upon the trial he swears that he went to several piles before he found the right one. This was shown to be false. Now, Hines may have told him where the gun was concealed, and may have given him such a description of the brush pile, its locality, etc., as to enable him to go at night directly to it; this, however, would be remarkable. But to give him such a description and such directions as to enable him to go at night directly to the right pile, and to the side of the pile of brush at which the gun was concealed, is not reasonable. Especially so, when considered in the light of his statement bearing upon this matter. He says that Hines told him that he had killed Ike Bailey with his (Cove's) gun, and pointed to some brush heaps and said it was under one of them. There is no pretense that the appellant pointed out the particular pile, or gave the witness such description of it as would enable him to go directly to it. This is contradicted by the witness himself, in this, that he "did turn down two or three brush heaps in hunting for the gun."

Now, under these facts it is reasonable to infer that this witness did not obtain knowledge of the whereabouts of the gun from the defendant. But, be this as it may, these facts, tending strongly to inculpate the witness either as a principal or an accessory, the question of accomplice *vel non* should have been submitted to the jury, with instructions that if they found him to be an accomplice then, to convict on his evidence, he should be corroborated as the law directs. As to whether Davenport was an accomplice or not, that also should have been submitted to the jury with proper instructions.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered January 26, 1889.