## W. I. BLALOCK v. THE STATE.

### No. 1738. Decided January 25, 1899.

**1. Negligent Homicide of the First Degree.**

One who does an act lawful in itself, from which damage results to another, is not answerable for such damage unless he has been guilty of negligence or other fault in the manner of doing the act. Our statute makes the doing of a lawful act in a negligent manner, with no apparent intention to kill, if death results, negligent homicide of the first degree.

**2. Same.**

A husband is not guilty of negligent homicide who, apprehending danger either to himself or her, takes a gun from his wife, although the muzzle is held by her and turned towards her at the time, she being killed in the scuffle for possession of the gun, and upon such state of facts it is not error to refuse to charge upon negligent homicide.

**3. Dying Declarations.**

Dying declarations are only admissible in evidence where the death of the party is the subject of the charge, and the circumstances of the death the subject of the declarations.

**4. Murder—Evidence—Ill Feeling.**

On a trial for murder, where there is an absence of any circumstance showing an intentional killing, testimony of ill feelings between the parties will not overcome positive facts showing how the killing actually occurred and create or make a case for the State.

**5. Sufficiency of Evidence.**

Persons can not be convicted of crime in this State on even a strong suspicion of guilt. The evidence should be such as to destroy the presumption of innocence beyond any reasonable doubt.

**6. Murder in the Second Degree—Evidence Insufficient.**
　See opinion for facts stated held wholly insufficient to support a conviction for murder in the second degree.

APPEAL from the District Court of Franklin.　Tried below before Hon. J. M. TALBOT.

Appeal from a conviction for murder in the second degree; penalty, fifteen years imprisonment in the penitentiary.

The indictment charged appellant with the murder of Mollie Blalock, on the 8th day of March, 1898, by shooting her with a gun.　Mollie Blalock was the wife of appellant.

The important facts, as shown by the evidence adduced at the trial, are fully stated in the opinion, and no further statement of them is necessary.

*Todd & Glass* and *S. D. Goswick,* for appellant.—The court erred in failing to charge on the law of negligent homicide.　Penal Code, arts. 689-691; McConnell v. State, 22 Texas Crim. App., 354; Howard v. State, 25 Texas Crim. App., 686; Morris v. State, 35 Texas Crim. Rep., 313.

The issue of negligent homicide was clearly raised by the evidence, and, in a felony case, every issue made by the testimony must be submitted to the jury.　Meuly v. State, 26 Texas Crim. App., 274.

The evidence is insufficient to show an intentional killing.

*Mann Trice,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of fifteen years; hence this appeal.

Appellant complains that the court failed to give a charge on negligent homicide, and he assigns this as reversible error.　The court did give a charge on murder in both degrees, manslaughter, and accidental homicide; and we think these charges of the court covered every phase of the case made by the testimony.　This was a case of a husband killing his wife in a scuffle over a gun under circumstances which authorized him to take the gun from her.　It is claimed, however, that, while he had the right to take the gun from his wife, he was negligent in the method of taking it from her.　We recognize the rule on this subject to be as follows: "One who does an act lawful in itself, from which damage results to another, is not answerable for such damage, unless he has been guilty of negligence or other fault in the manner of doing the act."　1 Thomp. Neg., p. 447, citing Losee v. Buchanan, 51 N. Y., 476.　Our statute is in accordance with this rule, which makes the doing of a lawful act in a negligent manner, with no apparent intention to kill, if death results, negligent homicide of the first degree.　We have examined the record in vain to find any testimony suggesting negligence on the part of appellant in taking the gun from his wife.　The testimony indi-

cates that she and appellant were engaged in a quarrel; and she went out on the gallery from the room where they were, reached up, and got the gun, evidently for some mischievous purpose; she says to break it and throw it away, and he says he apprehended that she might commit suicide with the gun. When she got the gun he rushed out on the gallery, seized it, and the struggle ensued. The testimony tends to show that in the struggle she got hold of the muzzle of the gun while her husband (defendant) had the breech, and it fired about the time he succeeded in getting it from her. She must have been very close to the muzzle when it was fired, as her clothes were set on fire, and the point of entry of the shot was not larger than a half dollar. Now, conceding that appellant had the right to take the gun from his wife, if he apprehended danger either to himself or to her, because she may have held the gun by the muzzle, it afforded no reason why he should release the gun, and turn it over to her. We fail to find, in his conduct in taking the gun from her, any evidence of negligence, requiring the court to give the requested charge on negligent homicide. The court did give a full charge on homicide by accident or misadventure. In this charge the jury was fully instructed that appellant had the right to take the gun from his wife, and if they further believed that, in taking same, the gun was accidentally discharged, and killed the wife of appellant, then to acquit him. And the jury was further instructed, in all of the court's charge on culpable homicide, to find that appellant intentionally shot deceased before they could convict him. This, it occurs to us, was the defense in the case, and was fully covered by the court's charge.

The only remaining question is, do the facts and circumstances contained in the record support the verdict of the jury? We have examined the record carefully, and we do not believe there is any material difference in regard to the circumstances attending the killing between the evidence of the State and the defendant. The State mainly relied on the dying declarations of deceased. We quote on this subject from the testimony of the witness Mrs. Aiken, who testified for the State, as follows: That she came to the house of defendant, where the shooting occurred, at the request of defendant, immediately thereafter. She says that, when she got there, she "found deceased lying on the bed, with a gunshot wound in her stomach, a little to the left side. I asked her how she felt, and she said she was going to die. I asked her how she came to get shot; and she said she and her husband (the defendant) were in the house quarreling, and she said she was afraid of him, and went out on the gallery, and got a chair, and got up in it, to get the gun, to shoot it off and break it; and, as she took the gun down, her husband came out there, and took hold of the gun, and they began to scuffle or struggle over the gun, and in the scuffle over the gun she was shot. I told her, if she killed herself, she could not go to heaven, and she stated she did not shoot herself. I asked her what was the cause of her being shot, and she said, 'Old Master Jealousy.' She said her husband accused her of being too intimate with a young man, and that she was innocent of the

charge. About that time her husband (the defendant) spoke up and said, 'Molly, you are guilty, and you know you are guilty.' She said she was innocent, and that God knew that she was innocent." Again this witness says: "When Dr. Green came, he told her if she had anything to say she had just as well tell it; that he could do nothing for her. He asked her to tell how it was, and she said: 'I guess I was to blame some. I got the gun first. I got it to shoot it off, and then break it to pieces. I have not got anything against defendant.' The deceased lived about three hours, dying about 10 o'clock p. m. She said to Dr. Green, if she was able, she could tell him a great deal." The other State's witnesses who heard said dying declarations substantially agree with Mrs. Aiken, and we do not understand defendant's witnesses to materially vary from said statement. Witness Newberry stated: "The defendant went in the house with them, and Mrs. Aiken began to talk to Mrs. Blalock, and she seemed to not want to talk. Defendant asked Mrs. Aiken to get deceased to make a statement of how it happened, and she said that, if we would go out, she would talk, and we went out on the gallery; and then defendant told me to go back, and hear what she said; and I went back near the door, but did not go into the room, and listened. I did not hear what she said. I did hear her say to Mrs. Aiken that she went out of the kitchen, and got a chair, and got down the gun, to shoot it off and break it; and that defendant came out, and got hold of the gun, and in the scuffle it was discharged, and she was shot." Defendant testified on this point substantially as follows: That he and his son Luther had some trouble about the boy's work; and the boy said he was going to leave, and he told him to go. The boy seems to have gone off that evening. That after supper he went into the kitchen, and said to his wife, "Come out, and sit down, and talk over the matter about Albert." "And she said, 'No, she did not want to talk to me; she had all she could stand.' And she went out on the gallery, and I heard her get a chair and set it down about under the gun; and I went out, and as I got out she was up in the chair, taking the gun down out of the rack; and I caught the gun, and told her to give it to me. I caught the gun first by the muzzle, and then I caught or got hold of it with my right hand, near back to the hammer, and with my left hand I caught the breech, and my wife caught the muzzle of the gun, and we began to scuffle over the gun, she pushing me to and fro with the gun. I made a wrench with the gun, to twist it out of her hands, and, in the shoving and scuffling, she shoved me off the gallery. The gun fired just as I fell off the gallery, or just as I struck the ground, I can not tell which. I did not shoot my wife on purpose. I can not tell for my life how the gun came to fire. My wife must have had it cocked when I got hold of it, and in the scuffle or fall it was discharged." That he went out on the gallery to prevent her from shooting herself, and from breaking the gun to pieces. That she had been attempting to commit suicide for more than two years. He narrates several occasions in which he and his wife struggled over this same gun,

and in one instance the gun was accidentally discharged. This is corroborated by one or two of appellant's children.

The State, in connection with the dying declarations of deceased, introduced evidence tending to show that the gun could not have been fired as deceased told witness it was. The State also introduced testimony showing a state of ill will between deceased and appellant for several years antedating the homicide; that he charged her with infidelity; and that on one occasion both parties seemed to want a divorce. In rebuttal of this ill feeling, defendant showed by a number of witnesses that his wife attributed their getting along badly more to herself than to the defendant; and it was shown that he provided very well for his family for a man of his means. This is substantially all of the testimony bearing on the question as to whether this was an intentional or accidental shooting.

We concede that, although the positive testimony regarding the homicide may tend to show an accidental killing, yet this may be overcome by circumstances showing an intentional killing, but the circumstances should be strong and cogent. Defendant alone, of all the witnesses, states how the killing actually occurred. The State introduced the dying declarations of his wife, evidently for the purpose of showing that the killing did not occur as defendant claimed, but that the fatal shot was fired intentionally. The rule on the subject of dying declarations is: "Such declarations are only admissible where the death of the party is the subject of the charge, and the circumstances of the death the subject of the declaration." 2 Lead. Crim. Cas., 2 ed., p. 394. Now, if we eliminate from the testimony of Mrs. Aiken all the testimony except that relating to the circumstances of her death, we have only a quarrel between deceased and her husband; that she went from the room where they were, and reached up where the gun was hanging in the rack, and got it down; that appellant immediately went to her, seized the gun, and endeavored to wrest it from her; and that in the scuffle over it the gun went off, and the load penetrated her body, which caused her death. We do not understand her to state that her husband shot her intentionally, because of jealousy, which she assigns as reason for the quarrel which induced her to get the gun. The record does not show that defendant knew she was getting the gun to break it. Nor do we understand that, because she told Mrs. Aiken (in reply to her admonition that if she killed herself she would not go to heaven) that she did not kill herself, she meant by that that her husband intentionally shot her. The gist of her declaration is simply to the effect that, so far as the circumstances of the killing are concerned, her husband and she were scuffling for the gun, and that in the scuffle the gun fired, and killed her. She did not undertake to say that it was intentionally done. Nor do we think it can be legitimately inferred from anything she said that she meant to convey that idea. And in this connection it is said, further on, that the deceased stated that she was to blame for getting the gun. We are the more constrained to this conclusion because there are no cir-

cumstances in the record indicating that at that time the wife's feelings were predisposed towards her husband. Furthermore, it is a potent circumstance that her husband insisted that the witness Aiken should get her to talk, and tell them how it occurred. Certainly, if he had a guilty conscience, he would not have made this insistence. In addition to this, his acts and conduct immediately subsequent to the killing all comport with his innocence. He does not disagree with his wife as to the circumstances attending the killing. On the contrary, her statement was necessarily a skeleton of the transaction, and his evidence supplements her statement with all the facts. So we take it, both from the dying declarations of the deceased and the testimony of the defendant, that this was an accidental killing. And this theory, springing naturally out of the testimony for the State and defendant, is not overcome by evidence showing that the parties did not get along well together as husband and wife. This evidence certainly would constitute a very potent factor in support of any testimony showing an intentional killing on the part of defendant; but, in the absence of any circumstance showing an intentional killing, the testimony of ill feeling between the parties will not overcome positive facts in the case, showing how the killing occurred, and create or make a case for the State. As has been said in a number of cases, persons can not be convicted of crime in this State on even a strong suspicion of guilt. The evidence should be such as to destroy the presumption of innocence beyond any reasonable doubt. In this case we do not believe that the facts shown in the record are sufficient to support the verdict of murder in the second degree, and the judgment is therefore reversed and the cause remanded.

*Reversed and remanded.*