### SIDNEY HARPER v. THE STATE.

No. 7046. Decided October 25, 1922.

Rehearing Denied November 29, 1922.

**1.—Murder—Infanticide—Charge of Court—Requested Charges—Defensive Theories.**

Where, upon trial of murder, charging defendant with killing his illegitimate child, after the court had charged in a general way on the facts in evidence, the defendant requested a charge that the court instruct the jury that if the death of the child was from suffocation en route between Sabinal and Utopia, to acquit; and in ..nother special charge, that if without any knowledge or participation on defendant's part there was something done to the child before it was put in his possession, which was calculated to or did cause the death of the child, to acquit the defendant, even though the child died while it was in his car, all of which the court refused; held: that the case being one of circumstantial evidence, the said requested charges should have been given.

**2.—Same—Negligent Homicide—Charge of Court—Requested Charge.**

Where, upon trial of murder, charging the defendant with killing his own child, the facts raised the issue, by way of circumstantial evidence, of negligent homicide, and the defendant in a timely and proper manner submitted a requested charge thereon, which was refused, the same was reversible error.

**3.—Same—Accomplice—Charge of Court—Requested Charge.**

Under Article 801, C. C. P., forbidding conviction upon the uncorroborated testimony of an accomplice under the facts of the instant case, the court committed reversible error in not submitting a charge on accomplice testimony, with reference to one of the State's witnesses, as requested.

42—92 T. C.

**4.—Same—Accomplice—Rule Stated—Principal—Accessory.**

An accomplice witness is a person who either as principal, accomplice or accessory is connected with a crime by an unlawful act, or omission on his part, transpiring either before, at the time of, or after the commission of the offense, and whether or not he was present and participated in the crime. Following Phillips v. State, 17 Texas Crim. App., 169, and other cases.

**5.—Same—Rehearing—Affirmative Charge—Rule Stated—Requested Charge.**

Where the State, in its motion for rehearing, insisted that the court's main charge was sufficient, held, that this court has often asserted the right of the accused to an affirmative presentation of his defensive theory raised by the evidence, and that a mere negative presentation of such theory in connection with the affirmative charge would not suffice.

**6.—Same—Malice—Affirmative Evidence—State's Witness.**

This court further holds that the testimony of a State's witness relative to a statement made by defendant which is denied by the latter is not sufficient affirmative evidence establishing the fact of malice on part of defendant, to remove the issue of malice *vel non* from that of being a matter of dispute on the trial.

**7.—Same—Accomplice—Charge of Court—Rehearing.**

In the condition of the record in the instant case, it was the duty of the trial court to submit a charge on accomplice testimony, and permit the jury to solve the disputed issues of fact.

Appeal from the District Court of Uvalde. Tried below before the Honorable Joseph Jones.

Appeal from a conviction of murder: penalty, improsonment in the penitentiary for ninety-nine years.

Opinion states the case. ○

*L. Old,* for appellant.—On question of negligent homicide: Seawell v. State, 148 S. W. Rep., 569; Saye v. State, 99 id., 551; Elliston v. State, 10 Texas Crim. App., 361; Smith v. State, 232 S. W. Rep., 811.

On question of accomplice: Barnes v. State, 232 S. W. Rep., 312.

On question of defense's theory: Slaughter v. State, 218 S. W. Rep., 767; Townsend v. State, 236 id., 100; Chandler v. State, 230 id., 1000; Hunter v. State, 31 id., 674.                    ○

*R. G. Storey,* Assistant Attorney General, and *J. Q. Henry,* District Attorney, for the State.—On question of requested charge on theory of defense: Joy v. State, 123 S. W. Rep., 588.

On question of accomplice; Rhodes v. State, 11 Texas Crim. App., 563; Allison v. State, 14 id., 122; Warren v. State, 132 S. W. Rep., 136; Barnes v. State, 232 id., 312; Dubos v. State, 13 Texas Crim. App., 418.

On question of negligent homicide; Naughton v. State, 67 S. W. Rep., 115; Clifton v. State, 84 id., 237.

On question of defendant's requested charges on his theory of defense; Jones v. State, 233 S. W. Rep., 847; Green v. State, 333 id., 962; Boaz v. State, 231 id., 790.

On question of defendant's confession: Casey v. State, 113 S. W. Rep., 534; Roberts v. State, 144 id., 235; Nicholson v. State, 239 id., 206; Guyon v. State, 203 id., 408; Collins v. State, 20 Texas Crim. App., 419.

MORROW, PRESIDING JUDGE.—The judgment condemns appellant to confinement in the penitentiary for a period of ninety-nine years for the offense of murder.

On December 4, 1921, Mary Keahey gave birth of an infant daughter called Sarah Lee Harper. The mother was the daughter of Mrs. Fannie Keahey, was unmarried, and resided with her mother at Sabinal. She had some months before the child was born taught school at a village in Uvalde County called Utopia, where the appellant lived and where she met him. Upon the birth of the child, the grandmother, Mrs. Fannie Keahey was informed by the mother that the appellant was the father of the child, and her brother and brother-in-law went to the home of appellant to inform him of the birth of the child. He said that he would marry its mother and came at once to Sabinal, and on the next day did marry the mother of the child.

Mrs. Fannie Keahey, a few hours after its birth, made arrangements to take the child to San Antonio with the intent to have it in the Salvation Army Home. Upon the arrival of the appellant, this intention was communicated to him by her, and he first objected, but ultimately consented, and the child was taken at night by its said grandmother, her son and son-in-law and the appellant to San Antonio, a distance of seventy-one miles. The night was cold, and they traveled in an automobile. The parties at San Antonio refused the tender of the child and it was returned the same night to Sabinal by the same means.

On the second day following, the child was taken by the appellant in his automobile and carried from Sabinal to Utopia, a distance of twenty-two miles, and some thirty days later, its body was found buried in the graveyard of Utopia. The discovery was made through the confession of the appellant in which he stated that he buried the child but that he did not kill it.

Mrs. Fannie Keahey was a witness upon the trial, as was also the appellant.

Touching the delivery of the child to the appellant upon the occasion of its death, Mrs. Fannie Keahey and several members of her family testified that the appellant claimed that he intended to take the child to Del Rio, which was about ninety miles distant; that it was to be taken at night in his automobile, and that it was there to be delivered to a friend of his whom he declared would care for it at

his expense. According to the testimony of Mrs. Fannie Keahey, the appellant, on leaving for his home, told her that he would return about eight o'clock on the following evening and take the baby to Del Rio; that he had a man to go with him and people there who would care for it; that he would need no member of the family to go with him; and that he instructed the witness to have everything prepared for the journey. She said that he returned according to the appointment, but that he was alone. She testified that she prepared the baby for the trip and described in detail the manner in which she did so, and said that she gave him hot water bottles and some nourishment; also the baby, which was wrapped in blankets folded four times, first in a cotton blanket and then in a woolen blanket. These blankets were fastened upon the baby so that they could not come off. Sofa pillows were given to the appellant upon which to lay the bundle containing the baby. She said:

"I then took the baby and handed it to him, or laid it in his arms, and it fretted a little bit, and I said to him; 'Hold it up to you so that it won't cry;' and so I handed it to him, and he took it carefully and he asked me about how to keep it from smothering, about keeping the cover out of its face, and I instructed him; he asked me that very carefully, about how to take care of it. He was just holding the baby on the sofa pillows."

This was done in the room where the baby's mother was, and the child was alive and in perfect health.

After the marriage ceremony, appellant went to his home, and according to his testimony, before his departure Mrs. Fannie Keahey requested him to return the next morning about dark; that this he did, coming in an automobile; that upon arriving she asked him what he was going to do with the child, and upon his replying that he did not know, she said that it must be taken away, and that he must take it away that night; that he objected to taking it for the reason that it had already been on a long trip and that it was cold. He asked Mrs. Keahey if the baby could stand the trip and she said that it had to do so, that she handed the child to him and he made inquiry touching its safety from suffocation, and received the reply that it was all right to leave the blankets just as they were and let no air to it, and to unroll the bundle when he reached his destination; that she gave him no hot water bottles but gave him a bottle of nourishment. Appellant further testified that when he arrived at the Keahey home, he had no design as to the dispostion of the baby, but when Mrs. Keahey became so insistent and told him that the child had to be carried away, he arrived at a decision to take it to his mother, who lived at Utopia. Mrs. Keahey suggested that it be taken to Del Rio. Appellant had not mentioned the matter to his mother. Mrs. Keahey instructed him to lay the child between the seats, and he placed the child in the car in accord with these instructions; that the child made no noise or

movement; that he traveled the main road to Utopia, about twenty-two miles. The road from Sabinal to Utopia was rough, particularly in places. He did not stop upon the road or touch the child, but went to his home when he reached Utopia. He went there for the purpose of taking the baby to his mother; that he picked up the bundle in which the child was situated: that he noticed that there was no movement of the child and felt its hand and face and they were cold; that he could hardly get his hand into the blankets where the child was; that his examination finally revealed the fact that the child was dead; that he was shocked and then took the child and buried it; that at no time did he offer it any violence and did not touch it during the trip until he reached his home, when he undertook to take it out of the car and discovered that it was dead.

About one month after the birth of the child, its body was found buried in another grave at the village of Utopia, where the appellant resided. The blankets in which it was wrapped were also found buried with it. The discovery, as above stated, was made through the confession of the appellant to the sheriff in which he admitted that he buried the child, but denied that he killed it. The witnesses describing the condition of the body at the time it was found, testified that one of its eyes protruded, and while there was no abrasion of the skin, there was a sinking in the forehead and blood about its nose and mouth. The State advanced the theory that the condition of the eye and forehead might be accounted for by a blow with the fist or some other weapon. One of the doctors stated that there was creptitation from which the inference might be drawn that the bones were broken. Other physicians testified that crepitation of a child so young might be accounted for from natural causes. Testimony from physicians was also given to the effect that suffocation might have produced the condition described by the witnesses and also that the depression in the forehead and the protrusion of the eye might have taken place after death, due to the pressure of the blankets that were upon the child or form contract with some other object.

The case, in all of its phases, was one depending upon circumstantial evidence and was so treated by the trial court in his instructions to the jury. The issues were submitted in paragraphs 7 and 8, which we reproduce as follows:

"Now, I therefore instruct you that if you believe from the evidence beyond a reasonable doubt, that the defendant, Sidney Harper, did, in Uvalde, County, Texas, as charged in the indictment, with malice aforethought, with a sedate and deliberate mind, and formed design to kill, did unlawfully strike the said Sarah Lee Harper on the head with some instrument and weapon to the Grand Jurors unknown, or in some way and manner or by some other means, instrument and weapons to the Grand Jurors unknown, or by striking the head and body or the said Sarah Lee Harper against some hard substance which was

to the Grand Jurors unknown, and thereby kill the said Sarah Lee Harper, you will find the defendant guilty of murder, and so state in your verdict, affixing the penalty therefor by death or by confinement in the penitentiary for life, or for any term of years not less than five.''

''If you believe from the evidence, or if you have a reasonable doubt, that the infant, Sarah Lee Harper, was dead when the defendant received it from Mrs. Fannie Keahey, you will acquit him. Or if you believe from the evidence, or have a reasonable doubt, that the child died while in transit from Sabinal to Utopia, from any cause whatever, without the defendant inflicting upon it any of the injuries by any of the means alleged in the indictment, as submitted to you in paragraph 7 of this charge, you will acquit him.''

In one special charge appellant requested that the court instruct the jury that if the death was from suffocation en route between Sabinal and Utopia to acquit; and in another special charge that if without any knowledge or participation upon the part of the appellant there was something done to the child before it was put in his possession on the trip from Sabinal to Utopia which was calculated to or did cause the death of the child, the appellant would not be guilty of murder, even though the child died while it was in his car. One of the special charges specifically directed the minds of the jury to the theory of suffocation; and another to that of injury from the roughness of the road over which the trip to Utopia was taken. All of these charges were refused.

The jury had no means of determining the cause of the death of the child at the time it died other than from circumstances.

Invoking the rule which asserts the right of one accused of crime to have his defensive theories submitted in an affirmative manner, appellant insists that his interests were not adequately protected by the main charge and that the court was not warranted in refusing the special charges mentioned. One of the theories of death, developed by the evidence, was that of suffocation. The testimony of the medical men suggested this, and the physical conditions also tended to support it. From appellant's standpoint, the child was delivered to him for transportation, completely wrapped in blankets of several thicknesses. In its preparation for the trip he took no part. The possibility of an infant so young and tender meeting its death by suffocation, under the circumstances, is not so remote, in our opinion, as to justify its ignoring in the charge in response to requested charges. That part of paragraph 8 which instructed the jury that if they believed from the evidence or had a reasonable doubt that the child was dead before it was received would not fully meet the complaint which we are discussing for the reason that it might not have been dead at the time he received it, yet it died from suffocation without his fault. Considering the tender age of the child, the distance that it was

carried by him from Sabinal to Utopia, and the character of the roads, considered in the light of the condition of the child and the wound upon its head at the time it was exhumed a month after its death, it would seem that in a case of this character the affirmative theory presented from the evidence that it might have received a jolt while traveling in the car resulting in its death should, upon request of appellant, have been specifically presented.

Appellant insists that the court was not warranted in refusing his request to instruct on the law of negligent homicide. Our statute, Article 1114 of the Penal Code says:

"If any person in the performance of a lawful act shall, by negligence and carelessness, cause the death of another, he is guilty of negligent homicide in the first degree."

The statute defines a "lawful act" as one not forbidden by the penal law, and which would give no just occasion for a civil action, and also states that to constitute this offense there must be an apparent danger of causing the death of the person killed, or some other. The law did not forbid the removal of the child, or that it be placed in the custody of some other person who would care for it, but it did require that those who performed this lawful act should, in doing so, refrain from negligence in the face of apparent danger of causing the death of the child. Our statute defining negligent homicide of the first degree is analogous to that phase of the common law offense of manslaughter, of which in the text-books it is said:

"The doing an act, or the imperfect performance of a duty, toward a person who is helpless, which naturally and ordinarily leads to the death of such person, is murder, if death or grievous bodily harm is intended; and manslaughter, if the cause is negligence."

So far as concerns the neglect of a mother to properly attend to a bastard child after birth, statutes exist in which the common-law is absorbed. Independently of those statutes, it may be generally stated that for a parent, having special charge of an infant child, to so culpably neglect it that death ensues as a consequence of such neglect, is manslaughter if death of grievous bodily harm were not intended; and murder if there was an intent to inflict death or grievous bodily harm." (Wharton's Crim. Law, 11th Ed., Vol. I, Secs, 483 and 484.)

Examples of the application of the principle, in our own courts, are found in Gordon v. State, 90 S. W. Rep., 636; Brittain v. State, 36 Texas Crim. Rep., 406; Reddick v. State, 47 S. W. Rep., 993; Morris v. State, 35 Texas Crim. Rep., 313; Anderson v. State, 27 Texas Crim. App., 177; Blalock v. State, 40 Texas Crim. Rep., 154.

From the State's standpoint, the appellant (the father of the infant child), desiring that its birth should be hidden, undertook to take it in an automobile on a cold night to Del Rio, a point some ninety miles distant, and according to appellant's theory, he undertook to carry it, by the same means, a distance of twenty-two miles over a

rough road.    The child was put in his car while he was unattended
and was prepared for the journey by its grandmother, Mrs. Fannie
Keahey.    The appellant was a young man without experience in the
care of children, and its grandmother was a woman, forty-five years
of age and the mother of five children, some or all of whom she had
raised.    The mother was available to nurse the child.    It had not been
accustomed to other nourishment.    The intensity of the cold rendered
it essential that the child be securely wrapped.    Its infancy precluded
its doing anything in its own behalf to prevent suffocation or shield
itself against any shock due to improper driving of the car or acci-
dental shocks which it might receive on the trip due to the roughness
of the road.    These conditions would seem to suggest that there was
apparent danger of causing the death of the child.    The cause of the
death of the child was disclosed by no direct evidence.    The appel-
lant's testimony negatives any intentional injury to it, and the same
is true of Mrs. Fannie Keahey.    The physical appearance of the child
at the time of its death with reference to bruises or wounds or evi-
dences of violence are unknown, save as they were deduced from the
testimony showing the appearance of the child after it had been
buried for about a month.    The condition then disclosed is accounted
for by conflicting theories such as it having been struck by appellant;
that it died from suffocation or had suffered an injury from the shocks
or bumps while it was riding in the car, not to mention the fact that
it may have died from exhaustion resulting from the unusual treat-
ment to which it had been subjected.    These circumstances impress us
with the view that the theory of negligent homicide should have been
submitted to the jury.    Timely and proper requests were made for
it and due complaint made and reserved to the refusal of the court to
embrace the subject in his charge or to read to the jury the special
charge.    In this particular, we are of opinion that the trial court was
in error.

In this connection, we advert to the complaint by the appellant of
the failure and refusal of the court to instruct the jury on the law of
accomplice testimony as embraced in our statute, Article 801, Code of
Criminal Procedure, forbidding conviction upon the uncorroborated
testimony of an accomplice.    Appellant justly contends, we think,
that this statute operates upon the testimony of Mrs. Fannie Keahey
and that her relation to the tragedy was one of fact for the solution
of the jury under proper instructions.

The Assistant Attorney General and District Attorney have dis-
played commendable zeal in the preparation of brief and argument,
bearing evidence of thought and research, combatting the propriety
of giving the instruction under consideration.    It is not alone to the
definition of an accomplice which is found in Article 79 of the Penal
Code that we must look to determine whether the rule of accomplice
testimony applies.    An accomplice witness is a person who, either as

principal, accomplice or accessory, is connected with the crime by an unlawful act or omission on his part, transpiring either before, at the time of, or after the commission of the offense, and whether or not he was present and participated in the crime. Phillips v. State, 17 Texas Crim. App., 169, and others cases collated in Vernon's Tex. Crim. Stat., Vol. 2, p. 732. Among the illustrative cases supporting the proposition that the charge should have been given, reference is made to Puryear v. State, 11 S. W. Rep., 1129; Martin v. State, 38 S. W. Rep., 194; Hines v. State, 10 S. W. Rep., 448; Mosely v. State, 67 S. W. Rep., 103.

Mrs. Keahey's anxiety to get rid of the child stands out pertinently in her own testimony as well as that of the appellant. As soon as she learned of the birth of the child, she inaugurated means of sending it away for the purpose of concealing its birth. She was an actor in the trip to San Antonio, and continued her importunities, and from her own testimony, it appears that she continued to act with the same design until the baby was deposited in the automobile of the appellant on the night of its death. She admits that in the beginning the appellant was reluctant to consent to any disposition of the baby. With her experience she must have been conscious of the apparent danger to its life involved in the transportation in the car of appellant, whether the destination was Del Rio, as she claims, or Utopia, as claimed by him. At least, the facts were such that the jury might have drawn such a conclusion. So, if it be conceded that her acts were without intent to take the life of the child, it cannot be said, as a matter of law, that they were not such as a person of prudence would not have done. Aside from the issue as to her conection with the offense of negligent homicide, there remains the question as to the cause of the death of the child. If it was due to suffocation, it was she who placed about it the blankets in which it died; if its death occurred before it was placed in the appellant's automobile, it was she in whose custody it was at the time of its death. She disclaims any intent of injury; so does the appellant, but in his case, so in hers, the intent was not a matter to be determined by words alone but one which the jury might solve from the evidence, taking into account the motives, acts and probable result.

From the foregoing it follows that it is the opinion of the court that a reversal should be ordered, and it is accordingly done.

*Reversed and remanded.*

ON REHEARING.

November 29, 1922.

LATTIMORE, JUDGE.—This case was carefully considered by each member of this court upon original presentation, and nothing new appears in the State's motion for a rehearing. We have often asserted the right of the accused to an affirmative presentation of his defensive

theory, if any, raised by the evidence on the trial, and that a mere negative presentation of such theory in connection with the affirmative charge in favor of the State applying the law to the facts, will not suffice. We further are of opinion that the testimony given by witness Calvert relative to a statement made by appellant, which is denied by the latter, is not sufficient affirmative evidence establishing the fact of malice on the part of appellant, to remove the issue of malice *vel non* from that of being a matter of dispute on the trial. At the time of the statement claimed by Mr. Calvert to have been made by appellant, the child was not born and such statement is easily susceptible of the proposition that the thing most had in mind by appellant was the preservation of the good name of the prospective mother of the child, and that said statement as same related to the child was of but secondary importance in the mind of the appellant.

The matters urged in the motion as of weight against our conclusion that under the facts a charge submitting the issue of accomplice testimony as applicable to the testimony of Mrs. Keahey, are none of them admitted facts but all are combatted by the accused. In such condition of the record it was the duty of the trial court to submit the law applicable and permit the jury to solve the disputed issues of fact under full and complete instructions as to the law.

Being of opinion that the case was rightly decided upon the original hearing, the State's motion for rehearing will be overruled.

*Overruled.*