## M. K. SIMMONS V. THE STATE.

No. 11094.    Delivered November 30, 1927.

Rehearing by State denied March 14, 1928.

**1.—Murder—Charge of Court—Failure to Submit Negligent Homicide— Error.**

Where, on a trial for murder it was disclosed that the pistol of appellant was fired with no apparent intention to kill deceased, but under circumstances making apparent the danger of causing the death of the person killed, the issue of negligent homicide is present in the case, and it was error for the court to fail to submit this issue in his charge. See McPeak v. State, 80 Tex. Crim. Rep. 54, and other cases cited in original opinion.

**2.—Same—Neligent Homicide—Statute Construed.**

Negligent homicide of the first degree is defined as a homicide by negligence, happening in the performance of a lawful act, a lawful act being defined is one not forbidden by the penal law, and which would give no just occasion for a civil action. Art. 1234 P. C., is illustrative of Art. 1231 P. C. The act of appellant in carrying a pistol and in firing same was not unlawful, and the law of negligent homicide was clearly invoked by the facts and circumstances of the case. See Gribble v. State 210 S. W. 215, Art. 1240 P. C.

**3.—Same—Evidence—Dying Declaration—Rule Stated.**

Deceased statement, made by him after his injury, at the sanitarium of a "damned argument" was inadmissible as a dying declaration even under a proper predicate. The statement of a fact, not connected with the immediate cause of death, is not admissible as a dying declaration. See Ex Parte Barber, 16 Tex. Crim. App. 369, and Winfrey v. State, 41 Tex. Crim Rep. 538.

ON REHEARING BY STATE.

**4.—Same—Charge of Court—Defensive Issue—Must Be Submitted.**

Where, on the trial there is any evidence raising a defensive issue, such issue must be covered by the charge of the court. Of course it is not for the trial judge nor for this court to say that such issue was or was not established. It is enough if the evidence raised it. This would require submission of the issue to the jury under appropriate instructions.

**5.—Same—Negligent Homicide—Statute Construed.**

Our statute makes negligent homicide of the first degree the doing of a lawful act in a negligent manner, with no apparent intention to kill, which results in the death of another. As illustrative of the correct interpretation of this statute see Morris v. State, 35 Tex. Crim. Rep. 313; Gordon v. State, 90 S. W. 636, and Blalock v. State, 40 Tex. Crim. Rep. 154.

Appeal from the District Court of San Patricio County. Tried below before the Hon. T. M. Cox, Judge.

Appeal from a conviction of murder, penalty twenty years in the penitentiary.

The opinion states the case.

*B. D. Tarlton,* for appellant.

*W. G. Gayle,* District Attorney; *J. W. Ragsdale* of Victoria, *W. B. Moss* of Sinton, *W. C. Linden* of San Antonio, and *A. A. Dawson,* State's Attorney, for the State.

MARTIN, JUDGE.—Offense murder, punishment twenty years in the penitentiary.

Appellant was a state game warden. In company with Deputy Game Warden Gates, he visited a ranch of which deceased, Bud Stoner, was foreman, for the purpose of securing

permission for his brother to hunt on the ranch. Arriving there about dark, he and deceased, Bud Stoner, began drinking. The testimony shows they were very friendly. Gates, Stoner and appellant left the ranch to go through the pasture to look for "head lighters"—that is, night-time hunters, who were violating the game laws. Appellant and Stoner continued drinking, Gates not participating. Returning, some banter was exchanged between them about the speed of appellant's car. Appellant in answer began racing his car, finally leaving the road and running into two mesquite trees, which tore the top off the car, and inflicted some injury on appellant. Gates then took the wheel. Going through a gate, witness, Gates, went to fasten it, and while there heard a shot. Deceased said, "Look out, Simmons, or you will hit me." About three shots were fired. The parties had immediately preceding this been joshing each other. Going back, witness, Gates, took the pistol away from appellant and threw it away. Deceased said, "I am shot." Appellant said about the time, "Let's get a doctor. I'll get a doctor. Bud, did I shoot you? I didn't shoot you, did I, Bud?" Witness Gates phoned for a doctor, who on the road found appellant about a mile from the scene of the difficulty with his car in a ditch, and the engine running wide open. The lights were on. Steam was escaping from the radiator. Appellant had his hands dropped down to his side and made no answer to questions of witness. "Didn't even look around," according to witness. Deceased was taken to Corpus Christi, was fully conscious on the road down there, and told witness and his companion that he was shot by a "quirvolo Mexican," interpreted to mean a yellow, dressed-up Mexican. Arriving at the hospital, still fully conscious, the state's witness, McClendon, a police officer, testified to statements of deceased in part as follows:

"It seems to me that it was Mr. Welder who first asked him (Stoner) if Simmons had shot him. As to how many people were questioning him there, well, Mr. Welder asked some, Mrs. Welder asked some, I asked some, and Doctor Nast asked a few. I couldn't say what he said in reply to Doctor Nast's questions—I don't remember what Doctor Nast asked him, but I know he was talking to him. What did he say in reply to Mrs. Welder's questions? Well, I think she was trying to get him to tell who killed him or who had shot him.

"Q. And he said a Mexican shot him?

"A. It came up several different times. * * *

"He (Stoner) at first said that a Mexican had shot him. There was something else said in between there, and I don't

know just what it was, but then the question was asked him, 'Did Simmons shoot you?' and he said 'Yes.'   At the time he made the statement about the Mexican shooting him, the question was asked, I believe, 'Do I know him?' and he said, 'Yes.' There were several developing that, but I couldn't say positively who was asking the questions.   It seems to me that it was Mr. Welder that asked the particular question, 'Do I know him?' Stoner's reply to that question was 'Yes.'   Then the question was asked him, 'Did Simmons shoot you?'   I do not know who asked him that question, but somebody asked the question, 'Did Simmons shoot you?'   He (Stoner) just turned over on the operating table on his side and just groaned out, 'Oh, hell, yes,' just what he said. * * *

"After Bud Stoner had said, 'Oh, hell, yes,' in reply to the question, 'Did Simmons shoot you?' I think the question was propounded to him, 'Had you-all ever had any trouble?' and he answered, 'A damned argument.' " * * *

The court charged on murder, but submitted no defensive issues except intoxication as a mitigating circumstance.  Failure to charge on the issue of negligent homicide was made the subject of timely exception and is urged on this appeal as error. We think the above evidence unquestionably raised the issue. There appears wholly lacking in the evidence any motive for the killing unless deceased's reference to a "damned argument" may be so construed.  The only argument, according to state's witness, Gates, seemed to have been with reference to the speed of appellant's car, already referred to.  The parties were joking each other up to the very moment of the difficulty.  Appellant was maudlin drunk and deceased practically so, according to Gates.   The statements of deceased and his actions after the trouble fail to show any feeling or ill will by him whatever against appellant and indicates instead a desire to protect appellant.   The only flash of a pistol seen by Gates was not towards deceased.

If the pistol of appellant was fired with no apparent intention to kill, but under circumstances making apparent the danger of causing the death of the person killed or some other, the issue of negligent homicide is present in the case.  McPeak v. State, 80 Tex. Crim. Rep. 54; Sewall v. State, 148 S. W. 569; Howard v. State, 25 Tex. Crim. App. 686.

The above rule is made plain by the following provisions of the Penal Code:

"To constitute this offense there must be an apparent danger of causing the death of the person killed or some other."

"To bring the offense within the definition of negligent homicide either of the first or second degree, there must be no apparent intention to kill."   (Arts. 1232 and 1235, P. C.)

An ingenious and able brief has been filed by counsel for the state, insisting that negligent homicide of the first degree does not exist as an offense because under its definition no state of facts could be proven which would come within its provisions in this:

It is defined as a homicide by negligence, happening in the performance of a lawful act, a "lawful act" being defined as one not forbidden by the penal law and which would give *no just occasion for a civil action*. Art. 1231, P. C. The position is taken that any homicide by negligence gives just occasion for a civil action under our law and therefore the offense cannot exist. "Lawful act," as used in the Penal Code, we think, means the act of anyone apart from negligence.  If the statute had defined the "negligent performance of a lawful act" as one giving no just occasion for a civil action, the state's contention would probably be sound.  Appellant was an officer.  He violated no law or legal duty in simply having and firing a six-shooter in an open pasture.  Apart from negligence this act per se gave no right of action for damages.  However, we need not rest our decision upon the above reasoning.  It finds ample and, we think, conclusive support in Art. 1234, P. C., itself, which provides:

"Throwing timbers by a workman from the roof or upper part of the house in a public street or highway, or where a number of persons are known to be around the house, or discharging firearms on or near a public highway other than a street in a town or city in such manner as would be likely to injure persons who might be passing, are examples of negligent homicide of the first degree, in case of death resulting therefrom.  If death is caused by the careless discharge of firearms in a public street of a town or city, the offense will be of a higher degree."

These examples of the legislative interpretation of this offense would all be impossible under the state's theory.

Justice Lattimore in the negligent homicide case of Gribble v. State, 210 S. W. 215, uses the following language:

"The act, if any, of appellant which caused the death of the boy, was the turning over of the boat, and this act is not a misdemeanor, nor *per se* would the same give just occasion for a civil action."

We might say in passing that the state's interpretation, if correct, would serve only to make the offense negligent homicide

of the second degree, as an unlawful act as part of such offense is defined as "such acts, not being penal offenses, as would give just occasion for a civil action." Art. 1240, P. C.

The admissibility of the various statements of deceased made at the hospital quoted above is the subject of bills of exception properly raising the point.

The statement "a damned argument" was inadmissible. The statement of a fact not connected with the immediate cause of death is not admissible as a dying declaration. Ex Parte Barber, 16 Tex. Crim. App. 369; Winfrey v. State, 41 Tex. Crim. Rep. 538. The remainder of this statement is of very doubtful admissibility, but since its surrounding facts do not appear to have been fully developed and its effect was not particularly harmful, we forego discussion or decision of point involved.

In view of another trial we will not discuss or pass on the question of the sufficiency of the evidence to sustain the charge of murder.

For the error pointed out, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the court.

### ON MOTION FOR REHEARING BY STATE.

HAWKINS, JUDGE.—Some complaint in the state's motion for rehearing is directed at the expression in our original opinion that "the only flash of a pistol seen by Gates was not towards deceased." This statement was a conclusion from the evidence of Gates, who said:

"I saw the flash of the last shot from the pistol just as I turned around. The pistol was elevated at the time I saw the flash from it—I saw the light of one of the shots, I guess the last one. The pistol was not elevated exactly straight up, but up about like that (indicating), I suppose at an angle of about forty-five degrees."

We only meant to convey the idea that from the evidence quoted it appeared the flash was not directly at deceased.

It is the contention of the state here, as it doubtless was in the court below, that the facts in evidence did not raise the issue of negligent homicide at all. Having in mind this position of the state we have again carefully reviewed all the evidence and have been unable to escape the conviction that

the issue of negligent homicide was raised.  Of course, it is not for the trial judge nor this court to say that such issue was or was not established.  It is enough if the evidence raised it.  This would require submission of the issue to the jury under appropriate instructions.

Art. 4671, Revised Civil Statutes, reads as follows:

"* * * An action for actual damages on account of the injuries causing the death of any person may be brought in the following cases.  1. When an injury causing death of any person is caused by the wrongful act, neglect, carelessness, unskillfulness, or default of another person. * * *"

The state presented oral argument and also filed a most plausible written argument in which the position is taken that if effect be given to the provision of the civil statute just quoted the law of negligent homicide of the first degree has been repealed.  What we conceive to be erroneous in the state's position is that the result—in so far as civil liability is concerned—of the negligent performance of an act has been confused with the act itself aside from negligence.  The writers of our code in defining negligent homicide of the first degree as the performance of a "lawful act" in a negligent and careless manner, and defining a "lawful. act" as one which would give no just occasion for a civil action (Art. 1231, P. C.), necessarily had reference to a "lawful act" as one which *per se* formed no basis for civil action.  That such construction must be correct is demonstrated by the very illustrations of negligent homicide of the first degree found in the statute (Art. 1234, P. C.), as well as in cases upon the subject found in our reports.  To charge negligent homicide of the first degree in an indictment it must be alleged that accused was engaged in the performance of a "lawful act," setting it out; this must be followed by the averment of negligence and carelessness in the performance of the act which in and of itself was harmless in the sense that *per se* it furnished no basis for a civil action.  The point we have in mind may be better understood by concrete illustrations.  In Morris v. State, 35 Tex. Crim. Rep. 313, it was averred that accused was performing a lawful act, to-wit: Driving a team hitched to a wagon along a public road.  There can be no doubt that the act of so driving along the road gave no "just occasion for a civil action," therefore, it was a "lawful act" under Art. 1231; but it was further averred that he negligently and carelessly drove at a furious rate of speed thereby throwing a party from the wagon and killing him.  The negligent performance of the "lawful act" might give just occasion

for a civil action, but if the party be proceeded against under the criminal statute it would be negligent homicide of the first degree, because the act of driving the wagon along the road was *per se* "lawful." Another illustration is found in Gordon v. State, 90 S. W. 636. A physician performing an operation is engaged in a "lawful" act which *per se* forms no basis for civil action. If it be performed negligently there would be occasion for civil action, but if criminal prosecution be lodged on account of the death of the patient it would be negligent homicide of the first degree. Why? Because the operation itself was "lawful." Still another illustration is found in the case of Blalock v. State, 40 Tex. Crim. Rep. 154, 49 S. W. 100, where the death of accused's wife resulted from his effort to take a gun from her. In that case, it is said:

"It is claimed, however, that, while he had the right to take the gun from his wife, he was negligent in the method of taking it from her. We recognize the rule on this subject to be as follows: 'One who does an act lawful in itself, from which damage results to another, is not answerable for such damage, unless he has been guilty of negligence or other default in the manner of doing the act.' 1 Thomp. Neg., p. 447, citing Losee v. Buchanan, 51 N. Y. 476. Our statute is in accordance with this rule, which makes the doing of a lawful act in a negligent manner, with no apparent intention to kill, if death results, negligent homicide of the first degree."

Being confirmed in our view that the issue of negligent homicide was raised by the evidence, that the omission to charge thereon was pertinently called to the court's attention, and that such omission was hurtful to appellant, it follows that the state's motion for rehearing should be overruled, and it is so ordered.

*Overruled.*