# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-01-00100-CV

**Stefanie Turnquist, Appellant**

**v.**

**Darrell K. Wood, Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
NO. 99-03327, HONORABLE F. SCOTT MCCOWN, JUDGE PRESIDING**

Appellant Stefanie Turnquist appeals from the district court's order giving appellee Darrell K. Wood the right to determine the primary residence of their son. We will affirm in part and reverse and remand in part.

## Factual and Procedural Background

Wood and Turnquist had an "on again, off again" relationship from the early 1990s until mid-1997. In April 1993, they had a son, D.W. When Wood and Turnquist ended their relationship, Turnquist took D.W. to live with her. In April 1999, an order was signed establishing that Wood was D.W.'s biological father, appointing Wood and Turnquist as joint managing conservators, and giving Turnquist the right to determine D.W.'s primary residence. Starting on May 1, 1999, and continuing until D.W. turns eighteen or graduates from high school, Wood was ordered to pay Turnquist $340 a month for on-going child support. The district court also found Wood owed $8,500 in retroactive child support, plus interest, and ordered him to pay this sum to Turnquist in

installments of $60 a month starting on May 1, 1999. *See* Tex. Fam. Code Ann. §§ 154.009, .131, 157.261 (West 1996 & Supp. 2001). If the $8,500 plus interest was not paid by the time D.W. turned eighteen or graduated, Wood was then to begin to pay Turnquist installments of $400 a month until the arrearage was paid in full.

About nine months later, in January 2000, Wood moved to modify the order. Wood's motion stated that D.W.'s circumstances had materially and substantially changed and that the earlier order had become unworkable or inappropriate. Turnquist had been injured in a car accident in November 1999 and since then had been in and out of the hospital. Wood alleged that Andrew Nash, Turnquist's fiancé with whom she lived, was interfering with Wood's possession of D.W. and was "aggressive and mean." Wood said he believed D.W. should live with him while Turnquist recovered and feared D.W.'s current environment might endanger his physical health or impair his emotional development.

In February 2000, the district court signed orders requiring Turnquist to surrender possession of D.W. to Wood and appointing a guardian ad litem for D.W. In April 2000, the court signed an agreed temporary order stating that D.W. would live with Wood until a final determination was made; another similar temporary order was signed in May. Turnquist was given possession of D.W. every other weekend and during vacations. A hearing was held in August 2000 and on November 20, 2000, the district court signed an order giving Wood the right to establish D.W.'s primary residence. The district court imposed a monthly $200 child support obligation on Turnquist. Turnquist was not to begin making payments immediately, however, because Wood was awarded the $8,500 money judgment Turnquist had against him for retroactive child-support as a "lump sum child

2

support" payment to cover her child support obligation until September 1, 2002. Starting on September 1, 2002, Turnquist was ordered to begin paying Wood $200 a month in child support. Upon Turnquist's request, the district court filed findings of fact and conclusions of law that the modification order was in D.W.'s best interest and that any other requested relief that was not granted was not in D.W.'s best interest.

On appeal, Turnquist contends (1) the evidence is legally and factually insufficient to show that D.W.'s circumstances had materially and substantially changed or that the order had become unworkable or inappropriate, and (2) that the district court abused its discretion in assigning to Wood her money judgment for past child support.

***Standard of Review for Sufficiency of the Evidence***

Following a bench trial, a trial court's findings of fact are reviewed for legal and factual sufficiency under the same standards as are jury answers to special issues. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). In considering the legal sufficiency of the evidence, we consider only the evidence that supports the trial court's findings and disregard all evidence and inferences to the contrary. *Catalina*, 881 S.W.2d at 297; *Jenkins v. Jenkins*, 16 S.W.3d 473, 477 (Tex. App.—El Paso 2000, no pet.). In reviewing factual sufficiency, we consider all of the evidence and reverse only if the trial court's finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Burtch v. Burtch*, 972 S.W.2d 882, 888-89 (Tex. App.—Austin 1998, no pet.). A trial court has wide discretion in determining the best interest of the child, and we will reverse a modification order only if the trial court abused its discretion, meaning the court acted unreasonably, arbitrarily, or without reference to any guiding principles. *Gillespie v. Gillespie*, 644

3

S.W.2d 449, 451 (Tex. 1982); *Ditraglia v. Romano*, 33 S.W.3d 886, 888 (Tex. App.—Austin 2000, no pet.). We will not reverse an order simply because we disagree with the trial court's decision. *Ditraglia*, 33 S.W.3d at 888.

A trial court may modify a joint conservatorship order if (1) the modification is a positive improvement for and in the child's best interest and (2) the circumstances of the child or the joint managing conservators have materially and substantially changed since the original order was rendered or the original order has become unworkable or inappropriate. Tex. Fam. Code Ann. § 156.202 (West 1996). The party seeking modification has the burden of showing that the requirements of section 156.202 have been met. *Ditraglia*, 33 S.W.3d at 888.

### *Witness Testimony*

There was substantial evidence produced at the hearing on Wood's motion to modify. Testimony was taken over two days from thirteen witnesses; Wood's witnesses testified at odds to Turnquist's. A summary of the testimony is necessary to evaluate the sufficiency of the evidence.

Wood was asked whether he was concerned that Turnquist was involved with Nash because he is part African-American. Wood answered, "I really don't want – I don't care what Stefanie does. I don't really exactly want my son brought up like that." Wood said that before Turnquist "started trading her body for drugs with black people," she was the most prejudiced person he knew. Wood said his bad attitude toward Nash was because Turnquist said Nash had beaten her. Wood denied teaching D.W., who was seven years' old at the time of the hearing, racist slurs and said he believes D.W. has learned them from language Turnquist uses when she is angry at Nash. Wood said that, while he was unstable and irresponsible as a young man, he was now stable and was

4

building a house on acreage where D.W. and his fiancée's two children from an earlier marriage would each have their own room. Wood testified that Turnquist has another personality, named Tina, that Turnquist invented when she was molested by her father. Wood said that Turnquist was a drug user until her car accident and that her personality was very different when she was using drugs. Wood believed Turnquist had largely stopped using drugs since the accident. Wood alleged that during the previous day's testimony, Nash made a threatening gesture at Wood.

Jennifer Zachary, Wood's fiancée, testified that she would not want to raise children in the neighborhood where Turnquist and Nash live because drug transactions occur along the main street. Zachary said Turnquist has asked that Zachary and not Wood bring D.W. back to Nash's house because Nash does not want Wood at the house or near Turnquist. Zachary recounted an incident when she and Wood picked up D.W. for a Christmas visitation. When they arrived at Nash's house, Nash rudely admonished them for not calling first and told them not to come on his property without making prior arrangements; after some delay Nash finally allowed D.W. to go with Wood. On another occasion, when Zachary returned D.W. to Nash's house, Nash was standing in the front yard holding a steel pipe in his hand while an unleashed pit bull-type dog stood nearby. Zachary said when she and D.W. got out of the car, Nash's greeting to D.W. was an unfriendly, "Get in the house boy." Nash then told Zachary he had called the police and they were on their way. She said she felt afraid and extremely intimidated by this encounter. Zachary said that when D.W. lived with Turnquist, his clothes were often too small or torn. Zachary believed that Turnquist and Nash allowed D.W. to watch violent television shows, such as professional wrestling, and movies that are inappropriate for his age. Since coming to live with her and Wood, Zachary said D.W. is not as

5

emotional, does not cry as easily, and seems more stable. He is well adjusted to their schedule and routines, although after visits with Turnquist, it takes D.W. at least three days to get back on schedule, depending on the length of the visit. D.W. also sometimes returns saying, "No, I don't have to. My mama said I don't have to mind you." After D.W. came to live with her and Wood, D.W. spilled his milk at the table and reacted as if he expected to be beaten for the spill. Zachary and Wood recently noticed a handprint-shaped bruise on D.W.'s leg, which D.W. said was from Turnquist spanking him. D.W. also has a scar on the back of one of his legs that he says is from being whipped by Turnquist with a belt.

Bryant Wood, Wood's mother, testified that Turnquist had confided in her that she was afraid of Nash because he had beaten her and kicked her out on numerous occasions. Bryant said up until the end of 1999, D.W. was "perfectly fine" until it was time for him to return to Nash's house, at which time he would "cry and cry and beg us not to take him home." Bryant said recently D.W. had changed and had become "very timid and very shy." Bryant said Wood did not get to see D.W. with any regularity in 1999 because it had to be all on Turnquist's and Nash's terms. On Turnquist's request, Bryant often picked up D.W. because Nash did not like Wood; Nash was always very polite to Bryant. Turnquist told Bryant that when Wood called Turnquist at Nash's home, Nash would get angry and Turnquist "would end up getting either beat up or yelled and screamed at." Bryant testified that since D.W. had gone to live with Wood under the temporary orders, D.W. was warm and loving and very happy.

Turnquist testified that she and Nash planned to be married in June 2001. Turnquist denied that her neighborhood was a high-crime area and said she felt safe there. Turnquist also

6

denied telling Wood's mother that Nash beat her. Turnquist said she and Zachary got along well. Turnquist said she asked Wood to call before coming to get D.W. because she and Nash never knew when Wood would show up. Turnquist testified that Wood is vulgar and mean to her and he calls her obscene names and "asks for sexual favors in lieu of child support." Turnquist said Wood often used racial slurs in front of D.W. Turnquist also testified that D.W. told her Wood called her bad names and told D.W. that she would kill D.W. while he slept. Turnquist said that in March 1999, Wood called her and was abusive and threatened her life. Turnquist told Nash about the incident and Nash called Wood and confronted him about it. Wood called Turnquist back, told her "not to have that N word call him ever again," and said he was on his way to get her; Turnquist called the police after Wood's threat. Turnquist testified that when Wood and Zachary came to pick up D.W. for Christmas visitation, Nash was not abusive but simply said, "Hold on one second, [D.W.] will be right here and I'm sorry I didn't know that you and [Turnquist] had talked on the phone." Turnquist said D.W. was no longer allowed to watch wrestling, but she did not see any harm in his having a towel or shirt with wrestling images on it. Turnquist admitted she had been arrested for possession of crack cocaine and put on probation, which required her to undergo drug rehabilitation and drug testing. In March 1998, Turnquist failed one of her drug tests, but she testified that she had not used illegal drugs or alcohol since that time.

Nash testified that he owns the duplex where he and Turnquist live. He said he never hit Turnquist and gets along well with D.W. Nash said after Wood threatened Turnquist, Nash called Wood and told him never to make a threatening call to Nash's house again. Nash said Wood "went ballistic" and started swearing at and threatening Nash and using racial epithets. When Wood and

7

Zachary came to pick up D.W. for Christmas visitation, Nash believed it was unannounced and told Wood, "Well, I think I've asked you – we've asked you not to just stop by the house and we would appreciate you giving us a call." As soon as Turnquist explained that Wood had arranged the pick-up, Nash allowed D.W. to go with Wood. As for the incident with the dog and steel pipe, Nash said earlier that day he visited Turnquist in the hospital while she spoke to Wood, who said he was not going to bring D.W. back to Nash's house. Nash told Wood to return D.W. that night and then contacted a police officer at the hospital who told Nash to go home and call the police "to come out and do a standby." Nash went home, called the police as instructed, and then took his dog for a walk in the yard. He noticed a metal pipe in the yard and had picked it up to put it in the trash when Zachary drove up with D.W. Nash said he and Zachary talked for five or ten minutes about why he had a problem with Wood coming to the house. Nash explained to Zachary that he would not have Wood coming to the house and acting disrespectfully toward Nash and Turnquist. He also told Zachary about Wood's threats not to return D.W. and use of racial slurs.

Janice Morgan, D.W.'s kindergarten teacher, testified that D.W. did fine in school and Turnquist was a very active parent volunteer. Morgan never saw any bruises or other evidence to indicate Turnquist had been beaten. India Vance acted as an "informal counselor" to Turnquist and taught D.W. from August 1999 through January 2000. Vance said D.W. was well liked by teachers and students and his school performance was average to a little above average. Vance said Turnquist volunteered with D.W.'s class and was very involved in his schooling. Vance thought Turnquist was a very caring mother, "always appropriate and a good mom." She never saw any evidence that Turnquist was emotionally unstable, and she said D.W. was always dressed appropriately and in clean

8

clothes. Vance said that after D.W.'s visits with Wood, he was upset and withdrawn and would not write or participate in group activities. Vance said after visits with Wood D.W. drew angry and ugly pictures.

However, Sandra Hendrick, D.W.'s current teacher, testified that when D.W. started in her class at his new school in January 2000 she was concerned because he had difficulty focusing, getting along with other children, and completing classwork. Further, his reading level was much lower than it should have been for his age and grade. She said D.W. improved greatly in March when Zachary started coming to school and reading to the class in the morning. She said D.W. "really wanted to be loved" and craved nurturing. After D.W. got acquainted with the other students and the routine, he settled down and improved. Hendrick said D.W. seemed more at ease with Wood and Zachary than with Turnquist. When Turnquist was to pick up D.W. for visits, he would start crying and would be physical and aggressive toward other children. In May, D.W. "started going back downhill. . . . He would start getting scissors and saying, I am going to kill you. And he just shut down." Hendrick also said Turnquist, as a convicted felon, would not be allowed to volunteer in the classroom.

Michelle Baker, D.W.'s babysitter, testified D.W. was playful and happy once he adjusted to new situations. She said that after visiting Wood, however, D.W. returned using racial slurs and acting aggressive toward other children in the group. Since going to live with Wood, Baker said D.W. was very quiet, did not smile, and was aggressive with other children.

Kelly Kochert, D.W.'s appointed guardian ad litem, testified that she had gathered information about D.W.'s situation and had interviewed people involved with him, including teachers,

9

therapists, and doctors. Kochert recommended joint conservatorship with Wood establishing D.W.'s primary residence. Kochert said she would like to see more monitoring and restriction of D.W.'s television viewing. She also stated that D.W. should not receive any corporal punishment. Kochert said she did not find Nash aggressive or mean. She said he has "some tension and has been upset," but his attitude was not the major difficulty regarding D.W. Kochert said this was a very close case and both Turnquist and Wood had things to offer D.W. Her recommendation was made with D.W.'s emotional needs as the primary concern and "as a cumulative effort of [her] whole investigation." Kochert believed Zachary was a stabilizing force for Wood. Kochert's main concern about Turnquist was her emotional health. Kochert described D.W.'s behavior in each parent's home. When he was with Wood and Zachary, D.W. was polite and interacted with Kochert. When he was with Turnquist and Nash, D.W. hardly acknowledged Kochert's presence, instead he concentrated on video games and had "much more defiant" interactions with Nash. Kochert said Turnquist did not have much authority over D.W. and she made her recommendation based on the parenting strengths and weaknesses witnessed at both homes.

Under the guise of arguing the sufficiency of the evidence, Turnquist also attacks Wood's pleadings as inadequate. Turnquist contends that the allegations in Wood's pleadings did not satisfy section 156.202 because Wood sought the modification on only two grounds—that Turnquist had been injured and D.W. should live with Wood during her recuperation and that Nash was aggressive and mean. Turnquist argues that Wood's pleadings did not allege facts showing a substantial change in circumstances or that the original order had become unworkable. *See* Tex. Fam. Code Ann. § 156.202.

10

The record does not reflect that Turnquist pointed out any alleged deficiencies to the district court, either by written motion or oral objection at the hearing. Further, while Wood's pleadings may not have set out an extensive recitation of all the circumstances he alleged had changed or rendered the original order unworkable, his pleadings clearly alleged that Nash was interfering with Wood's visitation with D.W., Turnquist was not in a position to care for D.W., and the overall situation rendered the original order unworkable and a possible danger to D.W.'s health and development. Turnquist alleges that the district court went beyond Wood's requested relief in naming Wood as permanent managing conservator, but Wood's pleadings asked that he be appointed "Temporary and Permanent Sole Managing Conservator of the child" or, in the alternative, that he be given the right to establish D.W.'s residence. The district court granted relief within the parameters of Wood's pleadings, in which he sought permanent sole conservatorship, in ordering that Wood establish D.W.'s primary residence.

### *Discussion of the Sufficiency of the Evidence*

Having reviewed the evidence in the light most favorable to the district court's modification order, we cannot say the evidence is insufficient to support the order. *Catalina*, 881 S.W.2d at 297. Two witnesses testified that Turnquist told them that her relationship with Nash was unstable and even violent. Several witnesses testified that D.W. was happier and more at ease with Wood and that Wood and Zachary were more involved with D.W.'s schooling than Turnquist and Nash. Wood, Zachary, and Wood's mother testified that Nash was interfering with Wood's possession of D.W. and that Nash's involvement made the current situation very tense and

11

threatening. Kochert, appointed to look after D.W.'s interests, recommended that D.W. be placed with Wood, who she viewed as more stable and better able to control D.W.'s situation.

As for the factual sufficiency of the evidence, even when viewed as a whole, the evidence does not show that the district court's order was so against the weight of the evidence as to be manifestly unjust. *Burtch*, 972 S.W.2d at 889. There was evidence presented that Nash is not violent, aggressive, or mean and that he has not unduly interfered with Wood's possession of D.W. There was also evidence that D.W. was happier with Turnquist than with Wood and that Wood was acting inappropriately in front of D.W. However, the district court, as the trier of fact, was in the sole position to observe the witnesses and D.W.'s overall situation. *Jenkins*, 16 S.W.3d at 477; *see also Burtch*, 972 S.W.2d at 888. As long as there is some evidence of a substantive and probative character to support the district court's decision, there is no abuse of discretion. *Jenkins*, 16 S.W.3d at 477. The evidence is factually sufficient to support the district court's order allowing Wood to determine D.W.'s primary residence. We overrule Turnquist's first point of error.

### Assignment of Judgment for Retroactive Child Support

In her second point of error, Turnquist contends the district court abused its discretion in awarding to Wood the money judgment she had earlier been awarded for retroactive child support. Turnquist argues that Wood did not request such relief and the value of the money judgment greatly exceeds the credit Turnquist was given for her current child support obligations.

In his pleadings, Wood requested to be allowed to determine D.W.'s primary residence. He also asked that Turnquist pay him child support and for all other relief, in law or equity, to which he showed himself entitled. Wood continued to owe Turnquist installments on the

12

prior money judgment.  After the modification hearing, Turnquist owed Wood monthly child support of $200.  To avoid both of them writing checks to each other, the district court decided to assign Turnquist's money judgment to Wood in satisfaction of her monthly child support obligations until September 1, 2002.  The district court said:

> Then I want [Turnquist] to pay $200 per month beginning the first of September in the year 2002.  So that gives [Turnquist] two years where she doesn't have to pay child support and that will wipe out then the arrearage, her arrearage.  The arrearage that he owes is going to be her child support for the next two years and then beginning the first of September in 2002 she will pay $200 a month.

The modification order provides:

> Stefanie Turnquist presently holds a judgment against Darrell K. Wood for child support growing out of the original proceedings in this cause.  The Court awards that judgment and the judgment lien attached to it and all of its attributes to Darrell K. Wood as lump sum child support from Stefanie Turnquist for the period from the date of trial [August 1 and 2, 2000] to September 1, 2002.  The judgment is hereby discharged along with all liens and other attributes and Stefanie Turnquist is given credit for it as lump sum child support for the period stated.

When Turnquist pointed out to the court that the credit she was receiving through September 1, 2002, was less than the amount Wood owed her, the court replied:

> There's no logic to your position.  I figured out the number of months he owed her child support and the number of months he didn't pay.  I've taken all that into account and it's – it's – it would be silly for me to raise up her child support post September simply to get a number that equals what he's paid her.  I mean, he owed her two years support that he didn't give her.  She is not paying support for two years.  The two years that he owed her that he didn't give her is going to be her credit back to him for the two years she is not paying.

13

The district court's intentions were practical, but as Turnquist pointed out at the hearing and now complains on appeal, its mathematics were faulty and failed to award her full credit for the approximately $8,500 money judgment remaining due to her at the time of trial. Giving Turnquist credit only for the period of time Wood had not paid child support, two years, and not for the actual sum Wood owes Turnquist is not an equitable way to determine the credit she should receive for her money judgment.

The judgment for retroactive child support was assigned to Wood in place of Turnquist's payments "from the date of trial to September 1, 2002." The date of trial was August 1, 2000; thus, the judgment was used to satisfy twenty-five monthly child support obligations. As Turnquist pointed out at trial, twenty-five payments of $200 totals only $5,000, while the assigned judgment was worth just under $8,500. The district court erred by failing to calculate the length of time it would take for $8,500 plus interest to be paid off by monthly credits of $200. Moreover, it is not certain how long D.W. will live with Wood. Nor is it certain that Turnquist's monthly child support obligation will continue to be set at $200; circumstances could change and might lead to her monthly obligations being increased or reduced or to a change in D.W.'s primary residence. Even assuming D.W. stays with Wood through September 1, 2002, the district court abused its discretion when it assigned the judgment as a lump-sum payment through September 1, 2002, depriving Turnquist of almost $3,500. Instead of assigning the judgment to Wood and discharging it in its entirety, the district court should have provided that each monthly obligation that Turnquist does not pay, currently set at $200 a month, will be applied as a credit against the money judgment that Wood owes her, which judgment will continue to earn interest at 12% per annum. *See* Tex. Fam. Code

14

Ann. § 157.265 (West Supp. 2001). Turnquist's money judgment and judgment lien shall remain valid until the judgment is paid in full.

We remand the portion of the district court's order assigning to Wood Turnquist's money judgment for entry of a new order providing that, although Turnquist need not actually make out-of-pocket child support payments of $200 a month, each support payment she now owes Wood shall serve as a credit against the money judgment she owns until the judgment is paid in full, at which time Turnquist shall begin making payments directly to Wood. We affirm the remainder of the district court's modification order.

_____

Jan P. Patterson, Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Patterson

Affirmed in Part; Reversed and Remanded in Part

Filed:   November 8, 2001

Do Not Publish